WALTER A. PEEK AND THERESA F. PEEK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peek v. Commissioner
Docket Nos. 42297-84; 42298-84.
United States Tax Court
T.C. Memo 1988-135; 1988 Tax Ct. Memo LEXIS 163; 55 T.C.M. (CCH) 509; T.C.M. (RIA) 88135; March 28, 1988. *163 Petitioner-husband, in a purported "sale" transaction, allegedly acquired part of a community antenna television system. Held, petitioners are not entitled to the losses and investment credit that they claimed with respect to the system. Held further, petitioners are liable for increased interest as determined under sec. 6621(c), I.R.C. 1954. Robert C. Agee, for the petitioners. *164 William S. Garofalo and Susan T. Becker, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notices of deficiency dated September 24, 1984, and September 25, 1984, respondent determined deficiencies of $ 18,378, $ 11,852 and $ 3,033 in petitioners' Federal income taxes for calendar years 1977, 1978 and 1979, respectively. The issues for decision are: (1) whether petitioners are entitled to the losses and investment credit that they claimed in connection with a community antenna television system; and (2) whether petitioners are liable for increased interest as determined under section 6621(c). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Walter A. Peek and Theresa F. Peek, husband and wife, resided in New Rochelle, New York, at the *165 time they filed their petition in this case. They timely filed joint Federal income tax returns for the years at issue with the Office of the Internal Revenue Service in Holtsville, New York. In 1977, Mr. Peek (petitioner), who owned a paper products company, met with his accountants to discuss a "Confidential Memorandum" and "Assumptions for Proforma Statements" prepared by Cable/Tel Corporation (Cable/Tel). [2] According to these documents, Cable/Tel acquired certain franchise rights in order to construct and operate community antenna television (CATV) systems and then sell interests in the systems, in the form of sole proprietorships, in exchange for cash and nonrecourse promissory notes, by owning and operating the systems, could claim depreciation, various business expenses and immediate investment credits with respect thereto. Although he *166 had no experience in owning or operating CATV systems, petitioner, by power of attorney, authorized Cable/Tel to acquire a system for him in either Kansas or Michigan. On or about November 29, 1977, he paid $ 5,000 in cash to Micro Constructors, Inc. (Micro), and executed the following closing documents: [3]
(a) an acquisition agreement, by which petitioner would receive rights in a CATV franchise that would permit him to operate a CATV system as a sole proprietor: (b) a management agreement, by which an affiliate of Cable/Tel, American Cablevision Management Corp. (American), would operate, insure, advertise, promote, and manage the system for petitioner; (c) a construction agreement, by which Micro would construct the CATV system and warrant all system equipment against defects; and (d) a security agreement for a nonrecourse working capital loan, two irrevocable letters of credit, and a $ 62,000 nonrecourse promissory note payable to Micro. [4]
*167 According to the agreements, petitioner would become the sole proprietor of a very small portion of a CATV system for Ypsilanti, a city in Washtenaw County, Michigan. Correspondingly, he would become liable for various managerial and operational fees, [5] and also would be subject to a "Purchase Option" in the management agreement enabling American to repurchase his system for, at a minimum, his total cash and nonrecourse note payments. [6]
*168 In reality, Cable/Tel did not acquire a franchise for Ypsilanti until December 18, 1977. Under the terms of that franchise, Cable/Tel had to obtain the consent of the Ypsilanti city council before transferring any franchise rights. However, Cable/Tel had not sought or obtained that consent and had not informed the city council of the ongoing sales in connection with the franchise. [7] Nonetheless, Micro, pursuant to the construction agreement, completed a network of CATV wiring for the Ypsilanti system in march of 1979. In accordance with that agreement, however, Micro did not initially connect the wiring to a main signal source for CATV transmissions and, correspondingly, the system generated very little revenue during the years at issue. [8]
Subsequently, the Division of Enforcement of the Securities and Exchange Commission *169 (SEC) investigated Cable/Tel and, in a memorandum prepared for the purposes of instituting fraud litigation, found that: [Cable/Tel] devised a scheme whereby, on paper, each investor purportedly owns a specific portion of a newly constructed CATV system with all the attendant profit and tax advantages of owning depreciable equipment and conducting an ongoing business venture [but] was selling neither cable television businesses nor sole proprietorships (as was claimed), nor were investors embarking on new careers in the CATV industry. Rather, [Cable/Tel] * * * was raising capital from the public in order to construct CATV systems by attracting investors with promises of large tax advantages as well as [the] high profits to be made * * *. In addition, the SEC found that Cable/Tel presented unrealistic profit projections, [9] overstated the purchase prices of the systems, [10] misrepresented certain cash transactions, [11] and misled the purchasers by representing that Micro would complete the CATV systems by the end of the year in which the purchasers executed their closing documents. [12]
*170 Petitioner, in contracting with Cable/Tel, failed to negotiate or initially investigate the transaction and, after executing the closing documents, failed to monitor the results of operations. For each of the years at issue, however, Cable/Tel instructed petitioner with respect to the amounts that he could claim for depreciation, miscellaneous deductions and investment credit as the result of his investment. Accordingly, petitioners, on their joint Federal income tax returns, claimed an investment credit of $ 6,700 in 1977, and reported losses of $ 29,706, $ 17,974 and $ 10,664 for 1977, 1978 and 1979, respectively. [13]
In his notice of deficiency, respondent determined that petitioners were not entitled to the losses and credit because, in the context of the alleged sale from Cable/Tel, petitioners did not acquire *171 an economic investment or the benefits and burdens of owning the system or, alternatively, because petitioners did not have a profit motive or otherwise were not "at risk" within the meaning of section 465. OPINION The issues presented are: (1) whether petitioners are entitled to the losses and investment credit that they claimed in connection with the system; and (2) whether petitioners are liable for increased interest as determined under section 6621(c). Losses and Credit
Respondent advances several grounds in his notices of deficiency for disallowing the losses and investment credit at issue, including a determination that, in the context of the purported "sale" from Cable/Tel, petitioners did not acquire an economic investment or the benefits and burdens of owning the system. Additionally, respondent argues on brief that the transaction is a "generic tax shelter" devoid of any economic substance. [14] In contrast, petitioners simply contend that they owned and intended to profit from their interest in the system and, therefore, are entitled to the corresponding tax benefits. On the record before us, we hold for respondent for the following reasons. *172 In order to respect a "sale" transaction, as in the present case, for Federal income tax purposes, the benefits and burdens of ownership must pass from seller to purchaser, considering: (1) whether legal title passed and how the parties treated the transaction; (2) whether the purchaser had vested rights of possession and whether the parties created present obligations to deliver title and make payments; (3) whether the purchaser paid the property taxes and bore the risks of loss or damage; (4) whether the purchaser acquired equity in the property and received profits from the operation and sale thereof; and (5) whether the parties engaged in arm's-length negotiations. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981), and cases cited therein; Falsetti v. Commissioner,85 T.C. 332, 348 (1985; see also Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on different grounds 544 F.2d 1045 (9th Cir. 1976). Considering these factors, we simply cannot conclude that petitioner acquired the benefits *173 and burdens of owning the system. First, the record contains no evidence that petitioner acquired legal title to the system but, to the contrary, indicates that Cable/Tel and its affiliates constructed, managed and acted as the owner of all system assets. [15] Additionally, the record indicates that petitioner, instead of investigating the transaction or ascertaining whether American performed any services, merely signed a package of documents reiterating that the seller, Cable/Tel, had complete control over the system. On this record, we cannot conclude that legal title passed or that the parties to the transaction treated the system as if such title passed. We further agree with respondent that petitioner's rights, if any, to receive title are impossible to determine, largely because the agreements, as stated by respondent on brief, involved "undefined rights and *174 a ludicrous structure dictated solely by tax considerations." We have noted that the parties did not treat the transaction as a present sale, and that petitioner's purported acquisition had no effect in view of the fact that, pursuant to the management agreement, American completely controlled the system. See, e.g., Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978). At most, we might conclude that, had petitioner paid the $ 67,000 purchase price in full, he might be able to demand possession of a portion of the system, but on this record, we cannot imagine that such a demand could occur. [16]
In addition, the record, although insufficient to determine actual or ultimate responsibilities for paying any property taxes, clearly indicates *175 that American had the duty to insure the system. In contrast, petitioner significantly lessened any exposure to potential risks by authorizing American to make nonrecourse note payments on his behalf and by covering any final payment due on the note by granting American an option to, as projected in the proforma, "repurchase" his system. In short, petitioner fails to persuade us that he was at risk beyond his initial cash contribution, or was engaged in a transaction involving any true risks of ownership. See, e.g., Grodt & McKay Realty, Inc. v. Commissioner, supra at 1242. Although petitioner paid $ 5,000 in cash in 1977 to Micro, the record contains no evidence that Cable/Tel actually applied that payment to the purchase price from escrow. [17] Additionally, petitioner made no payments on the nonrecourse note and, as time passed, received no profits from the operation or sale of the system. In short, petitioner and Cable/Tel used the note to allocate profits to Cable/Tel while purportedly increasing Mr. Peek's depreciable basis in the system. [18]
*176 Finally, petitioner by his own admissions at trial, failed to bargain or negotiate with Cable/Tel and, in general, misinterpreted the overall nature of the transaction.[19] This lack of arm's-length negotiations, together with the factors discussed above, cannot support a finding that the benefits and burdens of ownership passed to petitioner or that he acquired any equity in the system. Petitioner and Cable/Tel merely engaged in the pretense of a sale. [20] Effectively, petitioner paid a small amount of cash in exchange for depreciation and other hoped-for tax consequences although, in fact, Cable/Tel, and not petitioner, held the investment in the system. See, e.g., Knetsch v. United States,364 U.S. 361, 364-365 (1960); Estate of Franklin v. Commissioner, 544 F.2d at 1049. Consequently, we hold that petitioners are not entitled to investment credit or to any of the depreciation, interest, [21] and other expenses that they claimed as the components of their losses. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1243-1244; see also Estate of Franklin v. Commissioner, supra.
*177 Accordingly, petitioners are not entitled to the losses and investment credit that they claimed with respect to the system. Interest
Respondent also asserts that petitioners are liable for increased interest as determined under section 6621 (c). [22]Under the provisions of section 6621(c), an increased rate of interest applies to certain underpayments which exceed $ 1,000 and that are attributable to one or more "tax motivated transactions" for any taxable year. [23] "Tax motivated transactions" are defined as including "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(c)(3)(A)(i). In turn, a "valuation overstatement" exists if "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Section 6659(c). *178 In the present case, petitioners reported depreciation deductions and investment credit on their returns by claiming, as their initial cost basis, the entire amount ($ 67,000) that Cable/Tel charged to them for purportedly acquiring a system. However, as discussed above, no sale or passage of title occurred for Federal income tax purposes and, accordingly, petitioners' "correct" adjusted basis in the system is zero. Zirker v. Commissioner,87 T.C. 970, 978-979 (1986). Consequently, a valuation overstatement exists in the present case, and petitioners are liable for increased interest under section 6621(c), but only to the extent that the underpayments are attributable to the disallowed depreciation deductions and investment credit. Zirker v. Commissioner, supra at 979 and 981. Accordingly, we hold that petitioners are liable for increased interest, in accordance with the discussion above and as determined under section 6621(c), for each of the years at issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Cable/Tel was a member of a related group of corporations, known as the "Cable/Tel Group," that included a management company (American Cablevision Management Corp.), a construction company (Micro Constructors, Inc.), a cablevision company (Washtenaw Cablevision of Ypsilanti, Inc.), and other related and successor corporations. ↩
3. According to the proforma, these documents were necessary in order to obtain the full tax benefits of ownership. In the memorandum, however, Cable/Tel included the opinion of a law firm that, while detailing tax benefits that included investment credits and depreciation on amounts including the nonrecourse notes, warned that these transactions might constitute loans or other arrangements rather than true "sales" of CATV systems. ↩
4. Accordingly, the purported purchase price of the system, which consisted of the initial cash payment and the nonrecourse note, amounted to $ 67,000. ↩
5. Ultimately, Cable/Tel allocated fees and interest to petitioner of $ 19,581, $ 3,755 and $ 523 for 1977, 1978 and 1979, respectively. Correspondingly, petitioner made cash payments of $ 6,000, $ 7,000 and $ 7,000 in 1977, 1978 and 1979, respectively, but allocated the total of $ 20,000 solely to fees ($ 19,500) and franchise costs ($ 500) for 1977. ↩
6. Cable/Tel projected 4 payments on the note starting in 1982 and continuing through 1985, and a final payment of $ 35,332 in 1985 from proceeds of the "sale of [the] system" to American. Ultimately, however, petitioner made no payments on the note because, by its terms, it was repayable from the net income from the system and because, under the management agreement, American could make the payments on petitioner's behalf. ↩
7. In addition, Cable/Tel, apparently recognizing that it was required, under the terms of the franchise, to operate the systems by itself, used the management agreements to, in effect, prevent purchasers from operating the systems. ↩
8. Apparently, no revenues flowed to the system until 1979, when Cable/Tel allocated $ 523 of gross revenues to petitioner. ↩
9. The SEC, considering certain franchise restrictions and industry standards, concluded that Cable/Tel projected fee and subscriber figures that resulted in the unrealistic profit projections. ↩
10. Although found later as 9.2 to 11.5 percent, the SEC determined that Micro's construction costs were 6 percent of the total $ 71.8 million that it charged to the purchasers as the costs of acquiring the systems. ↩
11. For example, Cable/Tel diverted funds to its officers and paid substantial sales commissions, operating expenses and construction costs while having access to large amounts of cash collected from purchasers and earmarked for application to the purchase prices from an escrow account. ↩
12. Thus, although Cable/Tel represented in the memorandum that all systems would be completed before December 31, 1977, Micro did not complete the wiring for the Ypsilanti system until March of 1979. ↩
13. The investment credit represented 10 percent of petitioner's initial cash payment ($ 5,000) and nonrecourse note ($ 62,000), and the losses represented gross revenues (non in 1977 and 1978 and $ 523 in 1979) reduced by deductions for interest ($ 81, $ 3,755 and $ 40 in 1977, 1978 and 1979, respectively), depreciation and other miscellaneous expense items. ↩
14. Specifically, respondent argues that, as a "generic tax shelter," the transaction entailed overvalued, depreciable assets and nonrecourse notes not likely to be repaid, and that it lacked arm's-length negotiations and utilized promotional materials emphasizing tax benefits. See Rose v. Commissioner,88 T.C. 386, 408-415↩ (1987). Although respondent's argument has merit and might lead to the same result herein, we need not reach it because, as discussed more fully below, we find that petitioners did not acquire an economic investment or the benefits and burdens of owning the system. 15. Even if petitioner acquired the legal title, Cable/Tel retained significant control over the system and therefore could not, by transferring title in the present case, shift the incidents of taxation attributable to ownership. See Frank Lyon Co. v. United States,435 U.S. 561, 573↩ (1978). 16. The demand would be infeasible because, to quote from an analogy by the SEC, the transactions were like "a telephone company selling pieces of its telephone system * * * such that each investor would receive a specific area representing one street block * * * [resulting] in chaos unless the telephone company retained control of all the signal producing equipment * * * to insure uniformity of standards and service." ↩
17. Additionally, petitioner paid $ 20,000 during the years at issue and, instead of choosing equity, chose to receive, for the most part ($ 19,500), hoped-for tax deductions for system fees in 1977. ↩
18. For example, petitioner apparently was satisfied to "pay" the note with net income or proceeds from the projected "sale" of the system to American while, in the meantime, reporting losses by deducting, for the most part, depreciation from nonexistent or nominal system revenues. ↩
19. For example, petitioner testified that he was one of 714 partners in the CATV system. However, we do not accept that testimony considering, quite clearly, that he contracted voluntarily for a sole proprietorship and not a partnership. See Gregory v. Helvering,293 U.S. 465↩ (1935). Concomitantly, certain testimony, introduced by respondent under an exception to the hearsay rule as an admission against petitioner's alleged partner/agent, forms no part of our findings herein. 20. In contrast to this finding, petitioners assert that they had a profit motive and that respondent improperly and retroactively "penalized" them for the fraudulent acts of the promoters which interfered with their true intentions. However, we do not address this assertion, considering that it relates to respondent's determination, not addressed herein, that petitioners lacked a profit motive. Cf. Cherin v. Commissioner,89 T.C. 986, 999↩ (1987). 21. Although petitioners apparently assert that they were liable for interest on a working capital loan, the record contains no evidence that they actually paid or incurred any interest in connection with a genuine recourse indebtedness. See, e.g., Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985); see also Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on different grounds 544 F.2d 1045↩ (9th Cir. 1976). 22. Respondent, for all portions of the underpayments at issue herein, asserts the increased interest by amendment to his answer and, accordingly, bears the burden of proof with respect thereto. Sec. 6214(a); Rule 142(a); Zirker v. Commissioner,87 T.C. 970, 981↩ (1986). 23. The increased rate of interest applies only to interest accruing after December 31, 1984. See sec. 6621(c)(3)(C)↩.