WILLIAM M. MULDERIG AND JOAN G. MULDERIG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mulderig v. Commissioner
Docket No. 5978-92
United States Tax Court
T.C. Memo 1994-123; 1994 Tax Ct. Memo LEXIS 131; 67 T.C.M. (CCH) 2474; March 28, 1994, Filed *131 Decision will be entered under Rule 155. In 1982, the year in issue, P entered into an agreement with S to purchase from S a 75-percent interest in a racehorse; the agreement was contingent on S's exercising options to buy the interest. S later exercised the options, and P purchased, in a transaction that was not at arm's-length, the 75-percent interest in return for certain payments evidenced by an installment note. P obtained from C, a corporation of which P was president, the money to make the first payment on the note. Later in 1982, P sold a portion of his interest in the racehorse. On his Federal income tax return, P deducted expenses for depreciation, insurance, racing, and fees. Held: P's basis in the racehorse equals the cash P expended to purchase such horse. Held, further, P must reduce his basis for depreciation in the racehorse to reflect the sale of a portion of his interest therein. Held, further, the racehorse is properly depreciable over 3 years. Held, further, the money obtained from C is income to P. Held, further, P is not entitled to deduct unsubstantiated expenses. William M. Mulderig, pro se. For Respondent: Raymond *132 A. Kahna and Gregory Nickerson. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: William M. Mulderig and Joan G. Mulderig (petitioners) petitioned this Court for redetermination of respondent's determinations reflected in her notice of deficiency. Respondent determined a deficiency of $ 1,055,581 in petitioners' 1982 Federal income tax, and an addition to such tax under section 6653(a)[1] in the amount of $ 52,779. The issues for decision are: (1) Whether petitioners properly computed depreciation with respect to a horse; (2) whether petitioners are entitled to certain deductions for insurance, legal and professional services, racing expenses, and fees; (3) whether petitioners are required to include as income $ 1,031,250 that William M. Mulderig received from a corporation; and (4) whether petitioners are liable for an addition *133 to tax for negligence under section 6653(a). [2] We hold that petitioners are entitled to less depreciation than they claimed; petitioners are entitled to deductions for insurance and racing expenses in the amounts substantiated, and are not entitled to claimed deductions for their unsubstantiated legal and professional services and other fees; petitioners failed to include in income the amount received from a corporation; and petitioners are liable for an addition to tax for negligence. FINDINGS OF FACT Some of the facts have been stipulated and are so found. . The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Suffern, New York, at the time they filed their petition. Hereinafter, for the sake of convenience, the term "petitioner" in the singular is used to refer to William M. Mulderig. Petitioners' 1982 Federal income tax return included a Schedule C, Profit or Loss from Business or Profession, *134 for petitioner's trade or business, "Standard Bred Racing". All of the income and deductions for this business were related to a horse named Merger. Petitioner's 1982 Ownership Interest in Merger
Prior to petitioner's acquisition of his interest in Merger, David Morrissey (Morrissey), Peter Oud (Oud), and John Campbell (Campbell) each owned one-third of Merger. On January 1, 1982, Morrissey and Oud granted Finder-Guida Enterprises, Inc. (Finder-Guida), options to purchase their respective one-third interests in Merger for $ 2,083,333 each. Campbell granted Finder-Guida the option to purchase an 8-1/3 percent interest in Merger for $ 520,834. [3]
Morton Finder (Finder) was a well-known horseman and Louis P. Guida (Guida) had a high-profile position at Merrill Lynch. Finder and Guida told petitioner that Finder-Guida *135 had an opportunity to buy Merger, the fastest 2-year-old racehorse in history. On February 25, 1982, petitioner entered into an agreement to purchase Finder-Guida's entire interest in Merger for $ 6,187,500 (the Purchase Agreement), contingent on Finder-Guida's exercise of its options with Morrissey, Oud, and Campbell. [4] Under the Purchase Agreement, petitioner bore all risk of loss as a result of the death or disability of Merger. On March 5, 1982, the following *136 events occurred: (1) Finder-Guida exercised its options, purchasing a 75-percent interest in Merger for $ 4,687,500. Finder-Guida's obligation to pay this amount was evidenced by three promissory notes, one to each of Morrissey, Oud, and Campbell (the Promissory Notes). [5]
(2) Petitioner assumed Finder-Guida's obligations under the Promissory Notes. (3) Petitioner issued a promissory note to Finder-Guida for $ 1.5 million (the P Note), the difference between the purchase price paid by Finder-Guida and the price paid by petitioner. [6] Petitioner was required to make all his payments to Finder-Guida; Finder-Guida acted as the collection and distribution *137 agent for Morrissey, Oud, and Campbell. Petitioner's obligations under the Promissory Notes and the P Note (collectively, the Notes) were guaranteed by B. Roland Freasier (Freasier), a business associate of petitioner. *138 (4) Petitioner entered into a "Syndicate Agreement" with Finder-Guida under which petitioner would sell Merger to private investors through a limited partnership. Under the Syndicate Agreement, the complete ownership of Merger was divided into 40 "shares", each of which represented an undivided 2.5-percent interest in Merger. [7]
(5) Petitioner entered into "Security Agreements" with Morrissey, Campbell, Oud, and Finder-Guida. (6) Petitioner entered into a "Management Agreement" with Finder-Guida under which Finder-Guida would manage Merger. (7) Petitioner and Finder-Guida entered into a "Parity Agreement", under which petitioner and Finder-Guida agreed to share equally the following: (a) The $ 1.5 million profit from the sale of Merger to petitioner; (b) any profit from the management of Merger by Finder-Guida; (c) any profit from petitioner's syndication of Merger; and (d) any profit from the disposition of *139 Merger by petitioner or by an entity in which petitioner had an interest. The Parity Agreement specifically provided that half of the $ 1.5 million profit would be paid to petitioner as payments were made by petitioner under the Purchase Agreement. The Parity Agreement was executed, in part, so that petitioner could use Guida's name on a prospectus related to the syndication of Merger. After purchasing his interest in Merger, petitioner was shown and filed a United States Trotting Association (USTA) certificate of title stating that he owned 75 percent of Merger. Petitioner was also shown a Uniform Commercial Code Financing Statement dated March 18, 1982 (UCC Statement), reflecting his 75-percent ownership interest in Merger. Merger was over 2 years old at the time petitioner placed him in service. [8]
*140 Petitioner was the sole shareholder of the corporate general partner of a limited partnership, Pacer Racing and Breeding (Pacer). On June 21, 1982, Pacer issued a private placement memorandum (the Memorandum), in connection with the syndication of Merger. In the Memorandum, Pacer offered to sell 150 limited partnership units at $ 63,672 each. The Memorandum stated that Pacer would acquire an undivided 75-percent interest in Merger on November 1, 1982, if all 150 units in Pacer were subscribed for, but would acquire a smaller percentage interest in Merger if fewer units were subscribed for. The Memorandum also stated that petitioner would sell an unstated portion of his undivided 75-percent interest to Freasier, and Freasier would sell this interest to Pacer prior to December 31, 1982. The portion sold to Freasier would correspond to the interest that Pacer was required to purchase. The Memorandum further provided that Pacer would acquire title to Merger on November 1, 1982; [9] the business of Pacer would be racing and breeding Merger; and Campbell would have the sole discretion to make decisions on Merger's racing career. *141 On November 14, 1982, petitioner sold 13.5 percent of his 75-percent interest in Merger, that is, a 10.125-percent undivided interest in Merger, [10] to Freasier for $ 1,116,000. [11] On November 15, 1982, Freasier executed a promissory note in the amount of $ 1,116,000 in favor of petitioner. [12] Also in 1982, Freasier sold his 13.5 percent of the 75-percent interest in Merger to Pacer. [13] Freasier realized a profit of $ 1 million on this sale. *142 On his 1982 Federal income tax return, petitioner reported a basis of $ 5,244,063 in Merger. That number is derived by subtracting from the amount that petitioner agreed to pay for Merger, $ 6,187,500, a $ 125,000 reduction under the Parity Agreement (one-sixth of $ 750,000), yielding $ 6,062,500, and then subtracting $ 818,437, which must be the portion sold to Freasier; $ 818,437 is 13.5 percent of $ 6,062,500. It appears that in reporting $ 881,437 as his "cost", petitioner transposed two digits, instead of reporting $ 818,437 as his basis in the portion of Merger sold to Freasier. Alvin Q. Jarrett (Jarrett), another business associate of petitioner, purchased two units of Pacer. An unrelated trust had made large gifts of stock to Jarrett and Freasier, and they needed loans to pay the gift tax owed by the donor. Petitioner introduced Jarrett to John Higgins, *143 who was a senior vice president and loan officer of Nanuet National Bank. In order to obtain a loan from Nanuet National Bank, Jarrett and Freasier each needed a situs in New York State. Jarrett organized 17 Goshen Corporation (Goshen) in New York State with himself as sole shareholder and petitioner as its president; the principal business of Goshen was investment. Petitioner incorporated Blooming Grove Land Co., Inc. (Blooming Grove), in New York State; Freasier was sole shareholder of Blooming Grove and petitioner was its president. The first installment on the Notes was paid to Finder-Guida by a money order drawn on the account of Goshen at Nanuet National Bank on February 25, 1982, in the amount of $ 1,031,250. [14] In order to make this payment, Goshen borrowed $ 1,050,000 from Nanuet National Bank; petitioner in his capacity as president of Goshen signed a corresponding demand note to Nanuet National Bank, which listed interest at the rate of prime plus 1 percent. [15] This loan from Nanuet National Bank was collateralized by stock owned by Jarrett. Petitioner, in turn, executed a promissory note to Goshen in the amount of $ 1,031,250. The promissory note provided that *144 petitioner would pay Goshen $ 1,031,250 "with interest at 8 1/2%" on a date 10 years after the date of the note. No loan in the amount of $ 1,031,250 appears on the balance sheet of Goshen's Form 1120, U.S. Corporation Income Tax Return, for the year ended June 30, 1984. [16]
Petitioner paid Finder-Guida the second installment on the Promissory Note with a check dated January 11, 1983. Of the $ 1,553,373 second installment, $ 1 million came from a loan by Nanuet National Bank to Blooming Grove. In July 1984, petitioner, as general partner of Richmul *145 Associates, a partnership consisting of petitioner, Freasier, and Jarrett at all times relevant hereto, signed an assumption of all liabilities outstanding from the purchase of Merger. Petitioner entered into agreements with Morrissey, Oud, and Campbell whereby the sums due under the Notes were settled at a reduced amount. [17] Petitioner also entered into an agreement with Finder-Guida regarding the satisfaction of all outstanding liabilities on Merger owed by petitioner to Finder-Guida. [18] Richmul Associates established letters of credit in favor of Campbell, Oud, Morrissey, and Finder-Guida in the following amounts: [19]
Name
Amount Campbell
$ 366,667
Oud
366,667
Morrissey
366,667
Finder-Guida
193,000
Other than the amounts reflected in these letters of credit, the third through sixth installments of the Notes were not paid. *146 Petitioner's 1982 Expenses for Merger
On their 1982 Schedule C for Standard Bred Racing, petitioners used the cash receipts and disbursements method to report gross receipts of $ 163,658, deductions of $ 1,400,181, and a net loss of $ 1,236,523. The deductions consisted of depreciation in the amount of $ 1,088,143; insurance expense in the amount of $ 162,880; legal and professional fees in the amount of $ 10,500; racing expenses in the amount of $ 113,658; and other fees in the amount of $ 25,000. Raelyn Hirsch (Hirsch) assisted Arnold Reiss (Reiss), an accountant, in preparing petitioners' 1982 Federal income tax return. Hirsch and Reiss discussed how to depreciate Merger, and determined that they could depreciate him over 3 years because he was a racehorse over 2 years old at the time he was placed in service. Petitioners used the Accelerated Cost Recovery System (ACRS) to depreciate Merger. On their 1982 Federal income tax return, petitioners reported insurance expense of $ 162,880. Petitioners substantiated $ 155,015 of this claimed insurance expense by producing three canceled checks totaling that amount. Petitioners presented an accounting statement from East *147 Coast Management Services, Inc. (East Coast), for the period January 2, 1982, through October 31, 1984, to substantiate their claimed racing costs of $ 113,658. The East Coast statement lists expenses for Merger totaling $ 60,752.61 for 1982, but otherwise the dates cannot be read. Petitioners claimed a deduction for $ 25,000 in fees paid to East Coast for the 1982 calendar year. There is no evidence that petitioner paid any amount to East Coast during 1982. Petitioners claimed a $ 10,500 deduction for legal and professional services. There is no evidence that these claimed expenses were ever paid. Additional Facts
At all times relevant hereto, petitioner practiced law. Although tax was not his area of expertise, petitioner was familiar with tax law. OPINION Petitioner's Depreciable Basis in Merger
Respondent disallowed petitioners' deduction for depreciation of Merger, stating: The depreciation expense claimed in the amount of $ 1,088,143 is disallowed since have [sic] failed to establish the proper cost and depreciable basis of the horse and failed to establish the proper useful life and correct status as a racing horse or breeding horse for depreciation *148 purposes. In addition, you have failed to establish that you have proper title and ownership of the horse. Finally, you have failed to establish that the loans and notes obtained to purchase the horse are valid indebtedness. It is also determined that these loans inflated the purchase price of the horse. In addition, you have failed to establish any repayment of these loans.
We proceed to consider all of these arguments for reducing or disallowing petitioners' depreciation deduction. Petitioners bear the burden of proof. Rule 142(a); Welch v. Halvering, 290 U.S. 111, 115 (1933). Percentage of Merger That Petitioner Purchased in 1982
Petitioner asserts that he purchased a 75-percent interest in Merger; respondent argues that petitioner purchased this interest as nominee for himself, Jarrett, and Freasier, as equal owners. Petitioner introduced documents and testimony to support his assertion. In particular, petitioner introduced the UCC Statement, the USTA title certificate, his tax return, and the testimony of himself and Hirsch. The facts reflected in these documents and the record as a whole establish that petitioner purchased *149 a 75-percent interest in Merger in 1982, and only subsequently did Jarrett and Freasier directly or indirectly acquire interests in Merger. Thus, we agree with petitioner that he purchased a 75-percent interest in Merger in 1982. Petitioner's Basis in His Interest in Merger
Respondent argues that the notes used to purchase Merger were not valid indebtedness, or that they inflated the purchase price of Merger. As explained below, we agree with respondent that petitioner did not prove that the purported notes aggregating $ 6,187,500 constituted valid indebtedness in their entirety. A taxpayer's basis in property is generally the cost of the property. Sec. 1012. However, in some cases courts have ignored the taxpayer's stated cost for an asset where the stated cost did not represent the taxpayer's true economic cost for that asset. Bryant v. Commissioner, 790 F.2d 1463, 1465 (9th Cir. 1986), affg. Webber v. Commissioner, T.C. Memo. 1983-633; see also Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981). *150 In the instant case, the record contains numerous indications that these notes were not valid in their entirety, but merely served to inflate the purchase price of Merger. In addition, we are not convinced that petitioner was personally liable on the Notes. In this regard, we note the following: (1) There is no evidence that petitioner obtained an appraisal of Merger before (or after) purchasing him. We think it unlikely that a sophisticated person such as petitioner would pay $ 6,187,500 for an asset without verifying its value. (2) Petitioner's purchase from Finder-Guida was not an arm's-length transaction. Finder-Guida and petitioner simultaneously entered into a Parity Agreement, under which half of Finder-Guida's $ 1.5 million "profit" from the sale of Merger to petitioner would be refunded to petitioner as petitioner made payments on the Notes. In this respect, there is no evidence in the record indicating any rise in Merger's fair market value during the time Finder-Guida held the options, much less an increase to the tune of $ 1.5 million. (3) There was no apparent business reason for corporate entities of which petitioner was not a shareholder to make payments on *151 the Notes. (4) At the time he purchased Merger, petitioner already intended to syndicate Merger to a tax shelter. (5) There was no apparent business reason for Freasier to act as an intermediate purchaser of an interest in Merger; petitioner could have sold that interest directly to Pacer. By interposing Freasier as an intermediary, petitioner tried to inflate Pacer's basis in Merger. (6) There was no apparent business reason for Richmul Associates to assume petitioner's obligations outstanding from the purchase of Merger. (7) There was no apparent business reason for Morrissey, Oud, Campbell, and Finder-Guida to settle the Notes at reduced amounts. Since petitioner did not prove that the purported notes aggregating $ 6,187,500 constituted valid indebtedness in their entirety, we hold that petitioner's basis in Merger is $ 1,905,500; i.e., the net cash payments petitioner made in connection with purchase of Merger. Cf. Bryant v. Commissioner, supra at 1465; Lemmen v. Commissioner, 77 T.C. 1326, 1347-1348 (1981). [20] Petitioner did not prove that Merger had a fair market value greater than this amount. *152 Percentage of Merger Petitioner Sold in 1982
Although respondent argues that petitioner sold Freasier a 13.5-percent undivided interest in Merger, rather than 13.5 percent of petitioner's interest, the facts do not bear out respondent's contention. The agreement that petitioner and Freasier signed reflects a sale by petitioner of 10.125 percent of Merger, or 13.5 percent of petitioner's 75-percent interest. We note that the basis reported on petitioner's return is consistent with a reduction by petitioner for the sale of 13.5 percent of his 75-percent interest. Thus, we agree with petitioner that, in order to determine his depreciable basis in Merger, petitioner must subtract 13.5 percent of the amount that he paid for Merger. See sec. 168(d)(2)(B). Useful Life
Petitioner depreciated Merger over a 3-year period, claiming that Merger was a racehorse over 2 years old at the time he placed him in service. See sec. 168(h)(1)(A); H. Conf. Rept. 97-215 (1981), 1981-2 C.B. 481, 488. Respondent asserted in the notice of deficiency that Merger was not a racehorse, but rather was a breeding horse. We do not agree with respondent. All of the facts *153 indicate that Merger was used by petitioner only as a racehorse. If Merger was to be bred, it was after the sale to Pacer. Accordingly, we rule in favor of petitioner on this issue. Correct Depreciation of Merger
Based on the above discussion, petitioner must use Merger's basis of $ 1,905,500 as a starting point for computing his depreciable basis in Merger. Next, petitioner must reduce this amount by the 13.5 percent inferred that he sold to Freasier in 1982; [21] under ACRS, a taxpayer cannot depreciate an asset in the taxable year of its disposition. Sec. 168(d)(2)(B). Under ACRS, Merger had a depreciable life of 3 years; Merger must be depreciated accordingly, using the depreciable basis as computed above. Other Deductions
Respondent disallowed petitioners' deductions for insurance, legal and professional fees, racing expenses, and "other fees", claiming that petitioners *154 had not substantiated these deductions. Petitioners substantiated $ 155,015 of the insurance expense they claimed on their return, so we will allow that amount and disallow the remainder. Although petitioners claimed a $ 10,500 deduction for legal and professional services, they presented no evidence to substantiate that the claimed expenses were ever paid. Thus, we rule in favor of respondent on this issue. Although petitioners claimed a deduction for racing expenses in the amount of $ 113,658, they presented only the East Coast statement reflecting $ 60,752.61 of expenses with respect to Merger for 1982. Because the statement is unclear as to what portion of these expenses was incurred while petitioner owned an interest in Merger, we are unable to determine the amount of expenses incurred by petitioner. However, the record reflects that petitioner did incur some racing expense, so, we will allow petitioner $ 30,000 of the claimed expenses. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), affg. in part and modifying in part 11 B.T.A. 743 (1928). On their return, petitioners claimed $ 25,000 in "other fees", which *155 petitioner claims he paid to East Coast for the 1982 calendar year. Petitioners presented no evidence to substantiate any such fees, so we rule in favor of respondent on this issue. "Loan" From Goshen
Respondent alleges that petitioner's "borrowing" from Goshen was not bona fide indebtedness, but rather is "other income" to petitioners. [22] We hold that the transaction was not a loan to petitioner, but was income. To this end, Goshen's business was investing, yet Goshen borrowed money from Nanuet National Bank at 17.56 percent per annum and purportedly lent it to petitioner for 10 years at 8-1/2 percent. In addition, the record is devoid of any evidence indicating that the purported note from petitioner to Goshen was ever delivered to Goshen, that petitioner was bound to repay the "loan", or that he actually repaid the loan. We find it significant that the loan does not appear on the balance sheet of Goshen's 1984 Federal income tax return. *156 Addition to Tax Under Section 6653(a)
Respondent asserted that petitioners' underpayment of income taxes in each year was due to intentional disregard of rules and regulations, and determined an addition to tax for negligence under section 6653(a) in the amount of $ 52,779. For 1982, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence or intentional disregard of rules or regulations. Petitioners bear the burden of proving respondent's determination erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Although Hirsch prepared petitioners' return, petitioner was a lawyer and had some familiarity with tax issues; petitioners did not prove that they did not intentionally disregard rules or regulations. Accordingly, we sustain respondent's determination of this addition to tax. Based on our decision, we do not reach respondent's argument that petitioner was not at risk for the full amount of the Notes. We have considered the parties' other arguments and find them to be without merit. To reflect the foregoing, Decision will *157 be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. A $ 3,000 computational adjustment is also in issue.↩
3. In total, Finder-Guida Enterprises, Inc. (Finder-Guida), had the option to purchase a 75-percent interest in Merger for $ 4,687,500. John Campbell retained a 25-percent ownership interest in Merger.↩
4. The purchase agreement provides, in part, For purposes of this Agreement, the one-hundred percent (100%) ownership of MERGER shall be divided into forty (40) shares. The Purchaser [petitioner] agrees to pay to Finder-Guida for the purchase of a 75% ownership interest thirty (30) shares in MERGER the base purchase price of SIX MILLION ONE HUNDRED EIGHTY SEVEN THOUSAND FIVE HUNDRED DOLLARS ($ 6,187,500) * * *.
The purchase agreement also provides for bonuses for certain racing accomplishments of Merger to be added to the base purchase price.↩
5. Finder-Guida's note to Morrissey required payment of $ 2,083,333 in five level principal payments plus interest on the unpaid balance at the rate of 10 percent. Finder-Guida's note to Oud is nearly identical. Finder-Guida's note to Campbell required payment of $ 520,833 in five level principal payments plus interest on the unpaid balance at the rate of 10 percent.↩
6. Petitioner's note to Finder-Guida required repayment of $ 1.5 million in five level principal payments plus interest on the unpaid balance. In total, the Promissory Notes and the P Note (collectively, the Notes) required petitioner to make an initial payment on Mar. 5, 1982, and five installment payments. These installments were as follows: Date Principal
Interest Total
Mar. 5, 1982
$ 1,031,250
--
$ 1,031,250
Jan. 2, 1983
1,031,250
$ 522,123
1,553,373
June 15, 1984
1,031,250
718,767
1,750,017
June 15, 1985
1,031,250
371,250
1,402,500
June 15, 1986
1,031,250
247,500
1,278,750
June 15, 1987
1,031,250
123,750
1,155,000
The Purchase Agreement provided that all remaining installments and accrued interest on the Notes would become immediately due and payable if: (1) Any installment due on the Notes was not delivered to Finder-Guida within 60 days after its due date, or (2) petitioner became insolvent.↩
7. The Purchase Agreement specifically provided that petitioner would execute the Syndicate Agreement.↩
8. When Merger was a 3-year-old, he suffered injuries during the racing season. In addition, the results of his first breeding season were not as successful as expected. By 1989, Merger was virtually worthless.↩
9. We recognize that the Nov. 1, 1982, date on which Pacer would acquire up to a 75-percent interest in Merger is different from the Dec. 31, 1982, date up to which petitioner could sell this interest to Freasier and Freasier would resell it to Pacer. The record does not explain the discrepancy between these dates.↩
10. The private placement memorandum (the Memorandum) provided that the purchase of a minimum of 20 units was required for Pacer to commence the operations described therein. A 10.125-percent undivided interest in Merger is equivalent to 20.25 units. ↩
11. The Sale Agreement dated Nov. 14, 1982, between petitioner and Freasier provides in part: "For purposes of this Agreement, the 100% ownership interest of MERGER shall be divided into 40 shares. Purchaser hereby purchases and Seller hereby sells 13.5% ownership interest 4.05 shares in MERGER the base purchase price of $ 1,116,000.00." 4.05 shares equals 10.125 percent of Merger. The Sale Agreement further provides that the base purchase price includes bonuses for certain racing accomplishments of Merger; the purchase price could be reduced by certain stated amounts if certain bonus objectives were not achieved by Merger. ↩
12. In a statement attached to petitioners' 1982 Federal income tax return, petitioner reported that he "sold 13.5% of his ownership of a racehorse in 1982." Petitioner reported a "sales price" of $ 1,227,655, a "cost" of $ 881,437, and a "profit" of $ 346,218. Petitioner reported this "profit" using the installment method, see sec. 453; petitioner has not recognized his gain on any income tax return to date because he claims that Freasier has not made any payments.↩
13. The agreement between Pacer and Freasier provided that the purchase price would be reduced if certain bonus objectives of Merger were not achieved.↩
14. The first payment on the Notes was distributed by Finder-Guida as follows: $ 86,806 to Campbell, $ 347,223 to Morrissey, $ 347,224 to Oud, and $ 244,997 to Finder-Guida.↩
15. The prime rate on short-term business loans for February 1982 was 16.56 percent.↩
16. 17 Goshen Corporation (Goshen) did not file Federal income tax returns for the years ended June 30, 1982, and June 30, 1983. The record does not indicate that the loan had been repaid by June 1984.↩
17. Campbell, Oud, and Morrissey released all claims relating to security interests, financing statements, and other agreements that secured the Notes. In connection with the releases, Campbell, Oud, and Morrissey were to be paid $ 700,000 each, $ 333,333 on July 24, 1984, $ 200,000 on Jan. 24, 1985, and $ 166,667 on July 24, 1985. The releases called for the Jan. 24, 1985, and July 24, 1985, payments to be secured by irrevocable letters of credit drawn upon Chemical Bank. ↩
18. In connection with the Agreement, petitioner executed a Payment Agreement. The Payment Agreement provided that, in full satisfaction of petitioner's liabilities, petitioner would pay Finder-Guida $ 100,000 on Jan. 24, 1985, and $ 93,000 on July 24, 1985. The Payment Agreement further provided that these payments were to be secured by irrevocable letters of credit issued by Chemical Bank. In connection with the Payment Agreement, Richmul Associates issued two promissory notes to Finder-Guida, one in the amount of $ 100,000 payable on Jan. 25, 1985, which Richmul Associates paid on Feb. 21, 1985. The second promissory note, in the amount of $ 93,000, was payable on July 24, 1985. On Aug. 13, 1985, petitioner executed a check to Finder-Guida in the amount of $ 93,000. ↩
19. Richmul Associates obtained these letters of credit by pledging shares of certain stock owned by Jarrett and Freasier to Chemical Bank.↩
20. More specifically, petitioner's basis equals the amount of cash that he actually expended, i.e., $ 2,155,500, less the amount that Finder-Guida was obligated to return to petitioner during the 1982 and 1983 taxable years in which petitioner actually made payments on the Notes, i.e., $ 250,000.↩
21. Petitioner sold a 13.5-percent interest in Merger to Freasier, so petitioner must reduce his basis in Merger by 13.5 percent.↩
22. Respondent disallowed petitioners' loss on Schedule C relating to Merger and attributed to petitioners $ 1,031,250 of dividend income from Goshen. On July 23, 1993, respondent amended her answer to assert that in the event it is established that petitioner is not a shareholder of Goshen, the $ 1,031,250 is "other income" to petitioners. We agree with petitioner that he did not receive a dividend from Goshen; petitioner was not a shareholder of Goshen.↩