Paul and Robin MILLER
*v.*
DEPARTMENT OF REVENUE
(TC 3763)
Kathleen and Frank JOHNSTON
*v.*
DEPARTMENT OF REVENUE
(TC 3764)
Robert H. and Jane LOVERIN
*v.*
DEPARTMENT OF REVENUE
(TC 3768)

Ira R. Weatherhead, Fulsher & Weatherhead, Lake Oswego, represented plaintiffs (taxpayers).

James C. Wallace and Marilyn J. Harbur, Assistant Attorneys General, Department of Justice, Salem, represented defendant (department).

Decision for defendant rendered May 16, 1996.

**CARL N. BYERS, Judge.**

Plaintiffs (taxpayers) are members, or the spouse of a member, of limited partnerships whose returns for 1985 through 1988 were audited and revised by the Department of Revenue (department). The department's adjustments reduced the bases and increased the estimated useful lives of

depreciable assets. The department also reallocated partnership profits and losses. These adjustments resulted in assessments of additional income taxes and interest from which taxpayers appeal.

## FACTS

In 1984, Robert Loverin and Paul Miller, who are brothers-in-law, were employed by Rockwood Development Corporation (Rockwood), an Oregon corporation. Rockwood was owned by Miller's parents and other family members. Rockwood engaged in creating, purchasing, and managing low-income housing projects, most of which were owned by limited partnerships. Rockwood also developed, owned, and managed other projects such as commercial property, shopping centers, and office buildings.

In 1984, Loverin and Miller decided to start their own business because Rockwood was having financial difficulties. They formed BP Corporation to engage in the same kind of business as Rockwood. Knowing they did not have the level of management experience in low-income housing required by the U.S. Department of Housing and Urban Development (HUD), they obtained the extensive experience of Rockwood through a series of management agreements.

It was through Rockwood that Loverin and Miller became aware of Edward and Fern Fischer, owners of four low-income housing projects commonly known as Fischer Court I, Fischer Court II, East Ninth Street (Maple Court), and Southfair. In May 1984, Rockwood offered to purchase the four Fischer projects, but the Fischers rejected the offer. In September 1984, BP Corporation made an offer which the Fischers accepted. The offering price was $3,500,000, with $650,000 down and the balance of $2,850,000 in the form of a 15-year nonrecourse wrap-around note bearing nine percent simple interest.[1] The offer acknowledged that the properties were subject to HUD insured mortgages and required the Fischers to pay the mortgage payments out of the note payments they received from the buyers. The offer also provided that the Fischers would pay a real estate commission of six

---

[1] Although the offer as accepted provided for only simple interest, the actual note used in the transaction provides for interest to be compounded monthly.

percent ($210,000) to Rockwood, payable out of the final payment due the Fischers.

The principals of BP Corporation, Loverin and Miller, followed the methods for purchasing a subsidized project that they learned at Rockwood. They formed a limited partnership for each property and thereafter sought investors for the partnerships. Money invested by the limited partners would be used to make the down payments on the apartment projects.

Only Fischer Court I, Fischer Court II, and East Ninth Street Apartment Projects are involved in this litigation, Southfair being the subject of a separate case. The three projects involved the same process and types of documents. Therefore, for purposes of analysis, the parties and the court have focused upon one project, Fischer Court I.

On September 10, 1984, the Fischers accepted BP Corporation's letter offer to purchase the four apartment projects, including Fischer Court I. The same day, BP Corporation filed a certificate of limited partnership that identified Fischer Court I as a 48-unit apartment project and listed Loverin and Miller as the general partners. The general partners were to contribute cash of $2,460, and future limited partners were to contribute cash of $246,000, payable in installments over five years. The document identified Rockwood as the initial limited partner. BP corporation then assigned its contract rights under the offer and acceptance letter to the partnership.

On September 20, 1984, the partnership and the Fischers executed an agreement of sale providing for the purchase of Fischer Court I by the partnership for $1,224,000. In December 1984, this price was amended to $1,185,600 with $188,914 due at closing. The difference between the two amounts is a "finder's fee" of $38,400 mentioned in connection with the real estate commission payable to Rockwood of $71,136.

The down payment of $188,914, due at closing, was in the form of a nonrecourse note due January 1, 2000. The

note, dated December 11, 1984, provided that an "installment" of $188,914 was due on June 30, 1985, or upon completion of syndication, whichever occurred first. The note bore interest at nine percent compounded semi-annually. The balance of the purchase price was in the form of a "residual note" in the amount of $996,686. This note wrapped around the unpaid balance of the HUD mortgage on the properties. The balance of the HUD mortgage at the time of the agreement was $363,683.

Closing of the sale occurred on December 18, 1984, but documents were not recorded until the agreement was modified and the note extended. The seller's escrow instructions provided that if the project was not syndicated or the sellers did not receive the down payment, the buyer was to pay the escrow costs.

Loverin and Miller then solicited limited partners through private placement memorandums. Taxpayers were unable to find a copy of the private placement memorandum for Fischer Court I. They did find a copy of the private placement memorandum for Fischer Court II and offered it into evidence as being similar to the one for Fischer Court I. That document projected benefits for limited partners from November 1985 through December 1995. It projected no cash flow but only income tax deductions. The projection assumed investors in the 50 percent tax bracket and showed tax savings exceeding the limited partners' required annual investment (including interest) for every year except 1990. In 1990, the limited partner would be expected to contribute $4,760 in capital plus $583 in interest (total $5,343) while the projected tax savings were $5,104. Loverin and Miller experienced some delays but eventually obtained the limited partners necessary for Fischer Court I.

Upon audit, the auditor concluded that the property's sales price significantly exceeded the property's fair market value. The assessed value for property tax purposes in 1985 was land $98,370 and improvement $529,520, for a total of $627,890. The final agreed sales price was $1,185,600. Under the terms of the sale, the only payments to be made under the residual note were the amounts due on the HUD mortgage. The rest of the principal and interest were deferred. When

the note becomes due on January 1, 2000, the purchasers will owe $2,718,010.

The auditor concluded that because the debt was all nonrecourse debt and the amount of the money owing on the property exceeded its fair market value, the partners had no economic interest in the property. Moreover, the payments on the "down payment note" were delayed until August 1986. Until then, the partners had only been paying the underlying HUD mortgage and were not acquiring any equity in the property. Consequently, the auditor did not believe taxpayers were entitled to depreciation based on their cost basis. The auditor did recognize basis to the extent of fair market value, and separately considered personal property.

The auditor also increased the estimated life of the property for depreciation purposes from 15 years to 30 years. The auditor explained that the basic Internal Revenue Service life guideline for buildings is 45 years. Therefore, because the subject property was 15 years old at the time of purchase, the auditor reasoned that there should be 30 years left.

Finally, on their income tax returns, the general partners allocated 99.9 percent of the losses to themselves up to the time the investing limited partners were admitted. The auditor reallocated these losses according to the provisions in the limited partnership agreement, allocating two percent to general partners and 98 percent to limited partners.

## ISSUES

The three issues presented to the court are:

(1)   Did the purchase price exceed the fair market value of the property?

(2)   Was the use of a 15-year life for straight-line depreciation justified by component depreciation?

(3)   Were the general partners entitled to 99.9 percent of the profits and losses prior to the admission of investor limited partners?

## COURT'S ANALYSIS

### Did the purchase price exceed the fair market value of the property?

■■ Although the purchase was accomplished with non-recourse notes, those notes may be included in the basis of property for depreciation if the purchase price does not exceed the fair market value. If the purchase price exceeds the fair market value, the buyer has no economic incentive to pay the price and, therefore, no real interest in the property. *Lukens v. Com.*, 945 F2d 92, 91-2 USTC (CCH) ¶ 50,517 (5th Cir 1991). Whether the price exceeds the fair market value is to be determined at the time of purchase. *Est. of Franklin et al. v. Com.*, 544 F2d 1045, 76-2 USTC (CCH) ¶ 9773 (9th Cir 1976).

■ The department contends that the sale was not an arm's-length transaction. However, the sellers were not related to the purchasers. Mr. Fischer testified they had their own goals for long- and short-term benefits. The Fischers were unhappy with government bureaucracy and the problems of administering low-income housing projects. When the Fischers decided to sell the property, they wanted to deal with local people. The preponderance of the evidence indicates that the sale was an arm's-length transaction. However, this does not resolve the issue because use of nonrecourse debt may produce an excessive price even in an arm's-length transaction. *See, e.g., id.*

In examining the evidence of value, the court observes that the Fischers received four separate offers for their property. The Regency offer was for $3,400,000 with $510,000 down over three years and a nonrecourse wrap note for the balance. Rockwood made a similar offer of $3,500,000 for the four projects with $525,000 down, an additional $25,000 paid over four years, and a nonrecourse wrap note for the balance. The Tomlinson offer was for $2,500,000 with $523,000 down, assumption of $1,260,000 in mortgages, and a note of $771,000 for the balance. The BP Corporation offer, which was accepted by the Fischers, was for $3,500,000 with $650,000 down and a nonrecourse wrap note for the balance. The Tomlinson note did not involve nonrecourse debt and perhaps for that reason was approximately $1,000,000 less

than any of the other offers. Both the Rockwood offer and BP Corporation's offer called for the sellers to pay Rockwood a real estate commission of $210,000 even though the property had not been listed for sale.

In analyzing the sale, it is important to recognize that it was made subject to HUD. The note payments were tied to HUD payments, the property had to be operated in accordance with HUD requirements, HUD required reserves for replacements be maintained, and no cash could be distributed unless approved by HUD. The sellers could exercise their remedies under their security agreement only if HUD first declared a default and commenced enforcement of its own remedies.

The terms of the wrap note for the balance of the purchase price were changed. The original note submitted to HUD called for monthly payments of $7,475.15. However, the note was later amended to require payments in an amount equal to the HUD payments, which appears to be $4,503.06. Loverin testified that he and Miller expected to make a profit when the HUD restrictions expired in 1990. However, in 1990 Congress changed the subsidized housing law and made it more difficult to sell the project. Subsequently, the parties elected to stay in the government program for 50 years, expecting a cash out or refinancing in the range of $600,000 to $700,000.

One of taxpayers' witnesses had appraised the subject property for the purpose of obtaining HUD's approval of the sale. The appraiser did not remember what his opinion of value had been but was sure the per unit value ranged from $20,000 to $30,000. His replacement cost new estimate was $35,680 per unit. This was based on a cost rank of 3.7, which means that the improvements are "above average/high quality." This would indicate a cost new of the improvement in 1984 of $59.73 per square foot.

The appraiser was handicapped by the fact that no one could locate a copy of his 1984 fair market value appraisal report. The only appraisal report found was one he prepared for an apartment project in Portland. This was submitted as an example of the type of appraisal performed by the witness. Although that report dealt with a different

apartment project, it does raise questions with regard to the appraiser's methods. In that report, the Portland project achieved a net operating income of $14,540 per year *before* debt service and depreciation. Based on that net income, the appraiser concluded that the property had a fair market value of $380,000. This implies an extraordinary low capitalization rate.

The appraiser testified that it was difficult to say whether conventional apartments were worth more or less than HUD subsidized apartments. He indicated that HUD properties can be built without equity, they receive low interest rate loans, and HUD subsidizes the rents. On the other hand, conventional rental properties experience less expenses and higher rents.

Loverin testified that the interest rates in 1984 were extremely high, and the market for low-income housing was very active. However, Fischer Court I was operating at a net loss. Loverin testified they expected the property to be released from the HUD restrictions within five years, and a resulting increase in value would provide the profit for taxpayers.

The department hired an appraiser to estimate the value of the property for purposes of this proceeding. The appraiser did not perform a cost approach but did perform an income approach and a sales comparison approach. In his income approach, he estimated an effective gross income of $103,636, operating expenses of 40 percent or $41,450 (rounded), resulting in a net operating income of $62,186. Based on his analysis of the market, he estimated an overall capitalization rate of 8.5 percent. Dividing the net operating income of $62,186 by an overall capitalization rate of 8.5 percent gave an indicated value of $731,600 by the income approach.

In the sales comparison approach, the department's appraiser considered four comparable sales that occurred in May through August of 1984. The four sales had 68 to 92 units per project and sold for a range of $15,774 to $17,500 per unit. After comparing the rents of the comparable sales to the rents of the subject property, the appraiser selected

$15,000 per unit for the subject property. Multiplying the $15,000 per unit by 48 units gave him an indicated value of $720,000.

None of the comparable sales used by the department's appraiser was low-income housing. The appraiser testified that HUD rents may be affected less during a recession. He indicated he was not aware of sales in Salem of low-income housing in 1984. For perspective the appraiser looked at comparable sales occurring in 1992 through 1994. These sales ranged from $21,875 to $35,441 per unit. One of these sales had 48 units and sold for $23,875 per unit. All of the sales indicated an overall capitalization rate of approximately 10 percent. The assessed value of the subject property for the 1994-95 tax year was $938,770 or $19,558 per unit.

In analyzing the evidence of fair market value, the court will consider each approach separately.

■　　In the cost approach, the primary evidence of value was the estimate prepared by taxpayers' appraiser. This was not an appraisal but an estimate of replacement cost based upon characteristics fed into a computer. The department challenged the 3.7 ranking of "above average/high quality." The department's appraiser testified that the maximum rank is 4.0 and the subject low-cost housing is not more than 2.0 in quality. The photographs, the initial cost, and the descriptions of the subject property support finding that it is not high quality construction. Taxpayers' estimated replacement cost of $1,568,669 in 1984 is almost four times the original cost in 1970. That amount is not supported by the evidence and is not consistent with the income and sales of such properties. The only other estimate of replacement cost submitted by taxpayers was that of Harry Russell Associates for $1,108,000 in 1986. That estimate gave no indication of quality and no one testified how he derived the estimate.

■　　The most relevant evidence in the sales approach was the 1984 sales of comparable quality apartments that sold for $15,000 to $17,000 per unit. A decade later in 1994, the range for the sale of comparable units was $22,000 to $30,000 per unit. Although taxpayers' appraiser testified with regard to sales in the Portland area, those prices per

unit were significantly higher than in the Salem area. It may be the Portland metropolitan area has a different market or economy.

In the income approach, the department's appraiser estimated an income greater than actual, expenses less than actual, and derived a net income greater than actual for 1984. The appraiser used a capitalization rate of 8.5 percent, which appears justified by the market data. Using the greater than actual net income and a capitalization rate of 8.5 percent gave an indicated value by the income approach of $731,600.

Based on the evidence, the court finds that the fair market value of the property as of the date of sale in 1984 was $730,000. While there is evidence that others were willing to offer larger amounts, those offers were based on nonrecourse financing. Accordingly, it is necessary to examine the terms of the sale and how those terms may affect the purchase price.

As previously noted, every aspect of the sale was subject to HUD. In fact, the terms of the nonrecourse wrap note require the maker to apply the gross receipts from the operation of the project first to the payment of the HUD note, second to the amounts required to be deposited in the reserve fund for replacements, third to "all obligations of the Project other than the Mortgage insured held by HUD unless funds by payment are set aside or deferment of payment has been approved by HUD[,]" and finally to HUD any remittances due under the regulatory agreement but not yet due.

Under the terms of the wrap note, gross receipts from the project are applied the same way as they were before the sale. From the records presented, the cash flow from the project is inadequate to service the debt of the sale. This may be the reason the agreement contemplates that interest as well as principal will be deferred. By using accrual accounting, the partnership may deduct deferred interest for income tax purposes. The total due on the purchase instruments as of December 31, 1994, was $1,935,099. This is almost twice the amount of the original balance of the purchase price.

■     Based on all of the evidence presented, including properties not subject to low-income housing restrictions, the court finds it unlikely that the total amount due under the wrap note will ever be paid. An analysis of the project indicates there is no economic basis for the numbers involved except tax benefits. The inflated purchase price is acceptable to all parties because of the use of a nonrecourse note. The sellers, who undoubtably are not on the accrual basis, will report only the gains actually received. On the other hand, taxpayers, by the use of nonrecourse debt, create large tax deductions but no liability.

There are other factors indicating that although the parties dealt at "arm's length," they dealt cooperatively. After the sale, sellers could still refinance the HUD note. Moreover, the sellers could not declare default unless HUD declared a default and started enforcement proceedings. Finally, the closing statement, dated December 11, 1984, did not provide for a proration of the reserves, insurance, taxes, or rents.

■     Taxpayers argue that the sale was subject to approval by HUD, implying that HUD would not approve a sale for a price in excess of market value. However, the evidence showed HUD required only a replacement cost appraisal. HUD's attitude or policy with respect to syndications is unknown. HUD should have no objections to the subject transaction because HUD agreements took precedence over all other aspects of the transaction. There is no evidence that HUD verified the replacement cost estimates, let alone estimates of fair market value.

### Was the use of the 15-year life for straight-line depreciation justified by component depreciation?

Taxpayers claimed 15 years straight-line depreciation on the improvements. The department's auditor disallowed the 15 years as too short and estimated the remaining useful life at 30 years. During the appeal before the department, taxpayers obtained the services of an accountant to reconstruct how taxpayers may have justified a 15-year life. Taxpayers furnished the accountant with two replacement cost estimates. The cost estimates allocated the costs among

the component parts of the building, *e.g.*, roof, walls, electrical systems, based on their costs new and their different useful lives. The accountant used each component's cost and useful life to calculate an overall remaining useful life of 15.17 years. The department contends that this method is impermissible and gives an erroneous result.

■        The methods for establishing useful lives for purposes of depreciation have undergone many changes.[2] At one time, the Internal Revenue Service (IRS) held that taxpayers "ordinarily" could not use the component method for used buildings. Rev Rul 66-111, 1966-1 CB 46. In *Lesser v. Com.*, 42 TC 688 (1964), the court rejected the taxpayers' evidence of useful lives in the component method for a used building and, therefore, rejected the taxpayers' depreciation. On appeal, the appellate court upheld the Tax Court decision as not clearly erroneous. *Lesser v. U.S.*, 352 F2d 789, 65-2 USTC (CCH) ¶ 9743 (9th Cir 1965). It should be noted that those courts did not reject the component method *per se*. In *Harsh Investment Corp. v. U.S.*, 71-1 USTC (CCH) ¶ 9183 (D Or 1970), the court allowed the method for a 30-year-old building. Subsequently, in Revenue Rule 73-410, the IRS held that component depreciation may be applied to a used building

> "if the cost of acquisition is properly allocated to the various components based on their value and useful lives are assigned to the component accounts based on the conditions of such components at the time of acquisition." Rev Rul 73-410, 73-2 CB 53.

■        The court finds taxpayers' evidence fails to support a 15-year remaining life. The allocations were based on cost new, not on the condition and value of the components at the time of acquisition. The evidence does not support finding that an appraiser looked at the property for purposes of making those cost determinations. Taxpayers' allocation was just a replacement cost new estimate "without consideration of depreciation." Taxpayers' accountant was not qualified and did not make the necessary judgments. He relied only on the

---

[2] Guidelines were set in 1962. Rev Proc 62-21, 1962-2 CB 418. In 1971, an Asset Depreciation Range (ADR) was established and, shortly thereafter, the regulations set forth a Class Life System (CLS). In 1981, the Accelerated Cost Recovery System (ACRS) and Modified Accelerated Cost Recovery System (MCRS) were adopted.

information furnished to him, and did not know if personal property was included in the component groups. His calculations used cost new, but a class life that could only be for used property. As a result, the calculated weighted life is significantly understated.

Depreciation is supposed to reflect some degree of reality. It is not realistic to assume that residential property 14 years old in good condition had a remaining useful life of only 15 years. The evidence established the property was well maintained and, by being subject to the HUD agreements, would continue to be maintained. Taxpayers' appraiser inspected the property and observed it to be in "good condition." Taxpayers testified they signed a 15-year note expecting the property to be valuable at the end of that period. All of the evidence pertaining to the condition and expected useful life of the property is contrary to the assumption of a total 30-year life for the buildings.

**Were the general partners entitled to 99.9 percent of the profits and losses prior to the admission of investor limited partners?**

Taxpayers allocated 99.9 percent of their losses to the general partners and one-tenth of one percent to the initial limited partner until such time as the investor limited partners were admitted as partners. The auditor reallocated the losses based on the partnership agreement, which provided that two percent of the losses were to be allocated to the general partners and 98 percent to the limited partners.

Taxpayers argue that the allocations were made in accordance with the partnership agreement. However, section 8.1 of the original agreement, dated September 10, 1984, specifies that net profits, net losses, and net cash distributions shall be distributed as stated in section 1.5.1. Section 1.5.1. allocates two percent of the net operating profits to the general partners and 98 percent to the limited partners. The percentages of allocation vary for different types of distributions. All of this is contrary to taxpayers' position.

Taxpayers rely upon two statements at the end of the agreement next to the signatures of the general and limited partners. The statement accompanying the two general partners' signatures reads:

"PERCENTAGE OF
GENERAL PARTNERSHIP
INTERESTS HELD:

100%, divided among
the General Partners
as they agree by
separate agreement."

Next to the signature of the initial limited partner is the statement:

"NO. OF UNITS HELD/
PERCENTAGE OF
LIMITED PARTNERSHIP
INTERESTS:

1/100   /   .1"

On December 12, 1984, the partnership agreement was amended and restated. One of the amendments replaced Rockwood with American Properties Corporation as an initial limited partner. The agreement was further amended and restated on November 27, 1985, at which time section 1.5.1 was amended to allocate one percent of the profits and losses to the general partners and 99 percent to the limited partners. Section 8.1 also states:

"Prior to the admission of the Investor Limited Partners pursuant to Section 6.3, Operating Profits and Losses shall be allocated among the General Partners and the Original Limited partner as they may agree."

Again, at the end of the document next to the signatures of the two general partners is a statement indicating the two general partners hold 100 percent of the general partnership interest. A separate statement indicates that American Properties Corporation was withdrawing as an initial limited partner and 21 individuals listed in an attached schedule A

were limited partners. There are no signatures for the 21 limited partners.

■     Taxpayers contend that during the subscription period, the initial limited partner was to receive an allocation of one-tenth of one percent of the profits and losses, and the general partners were to receive 99.9 percent of the profits and losses. Taxpayers argue that only after the investor limited partners were admitted did the allocations in section 1.5.1 of the agreement control. Initial limited partners were there for form only and were not intended to receive allocations. While taxpayers' explanation makes sense and may have been their intent, it contradicts the written agreements.

The partnership agreements are not ambiguous, and they do not provide what taxpayers claim. The "allocations" at the end of the agreements do not allocate profits and losses. They merely set forth the percentages of the types of partnership interests owned by the partners. The statements declare that the general partners hold 100 percent of the general partnership interest, and the initial limited partner holds only one-tenth of one percent of the limited partnership interest. There is nothing in this language to indicate that the general partners, as a result of holding 100 percent of the general partnership interest, would receive an allocation of 99.9 percent of the profits and losses.

It is noteworthy that even when the parties amended the profit and loss allocations in November of 1985, the end of the agreement still shows the two general partners holding 100 percent of the general partnership interest. If the statement at the end indicated that the two general partners hold only 99.9 percent interest there might be some basis for arguing ambiguity. However, where the amount is 100 percent, as it consistently is, it must be viewed as a statement of who owns the general partnership interest, as opposed to an allocation of profits and losses. Although section 8.1 indicates that the parties may allocate the profits and losses "as they may agree," the only evidence of such agreement are the statements described. In the absence of any other agreement, those statements control the tax consequences with regard to the parties.

Based on the findings and analysis set forth above, the court finds that the department's opinion and order must be modified. Judgment will be entered consistent with this opinion. The department is awarded costs.