ESTATE of Charles T. FRANKLIN, Deceased, et al., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 75–3665.

United States Court of Appeals, Ninth Circuit.

Nov. 1, 1976.

Rehearing and Rehearing En Banc Denied Feb. 1, 1977.

William M. Schindler (argued), of Luce, Forward, Hamilton & Scripps, San Diego, Cal., for petitioners-appellants.

Daniel Ross, Atty. (argued), of Tax Div., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before BARNES, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This case involves another effort on the part of the Commissioner to curb the use of real estate tax shelters.[1] In this instance he seeks to disallow deductions for the taxpayers' distributive share of losses reported by a limited partnership with respect to its acquisition of a motel and related property. These "losses" have their origin in deductions for depreciation and interest claimed with respect to the motel and related property. These deductions were disallowed by the Commissioner on the ground either that the acquisition was a sham or that the entire acquisition transaction was in substance the purchase by the partnership of an option to acquire the motel and related property on January 15, 1979. The Tax Court held that the transaction constituted an option exercisable in 1979 and disallowed the taxpayers' deductions. *Estate of Charles T. Franklin*, 64 T.C. 752 (1975). We affirm this disallowance although our approach differs somewhat from that of the Tax Court.

The interest and depreciation deductions were taken by Twenty-Fourth Property Associates (hereinafter referred to as Associates), a California limited partnership of which Charles T. Franklin and seven other doctors were the limited partners. The deductions flowed from the purported "purchase" by Associates of the Thunderbird Inn, an Arizona motel, from Wayne L. Romney and Joan E. Romney (hereinafter referred to as the Romneys) on November 15, 1968.

Under a document entitled "Sales Agreement," the Romneys agreed to "sell" the Thunderbird Inn to Associates for $1,224,-000. The property would be paid for over a period of ten years, with interest on any unpaid balance of seven and one-half percent per annum. "Prepaid interest" in the amount of $75,000 was payable immediately; monthly principal and interest installments of $9,045.36 would be paid for approximately the first ten years, with Associates required to make a balloon payment at the end of the ten years of the difference between the remaining purchase price, forecast as $975,000, and any mortgages then outstanding against the property.

The purchase obligation of Associates to the Romneys was nonrecourse; the Romneys' only remedy in the event of default would be forfeiture of the partnership's interest. The sales agreement was recorded in the local county. A warranty deed was placed in an escrow account, along with a quitclaim deed from Associates to the Romneys, both documents to be delivered either to Associates upon full payment of the purchase price, or to the Romneys upon default.

---

1. An early skirmish in this particular effort appears in *Manuel D. Mayerson*, 47 T.C. 340 (1966), which the Commissioner lost. The Commissioner attacked the substance of a nonrecourse sale, but based his attack on the nonrecourse and long-term nature of the purchase money note, without focusing on whether the sale was made at an unrealistically high price. In his acquiescence to *Mayerson*, 1969–2 Cum. Bull. xxiv, the Commissioner recognized that the fundamental issue in these cases generally will be whether the property has been "acquired" at an artificially high price, having little relation to its fair market value. "The Service emphasizes that its acquiescence in *Mayerson* is based on the particular facts in the case and will not be relied upon in the disposition of other cases except where it is clear that the property has been acquired at its fair market value in an arm's length transaction creating a bona fide purchase and a bona fide debt obligation." Rev.Rul. 69–77, 1969–1 Cum.Bull. 59.

The sale was combined with a leaseback of the property by Associates to the Romneys; Associates therefore never took physical possession. The lease payments were designed to approximate closely the principal and interest payments with the consequence that with the exception of the $75,000 prepaid interest payment no cash would cross between Associates and Romneys until the balloon payment. The lease was on a net basis; thus, the Romneys were responsible for all of the typical expenses of owning the motel property including all utility costs, taxes, assessments, rents, charges, and levies of "every name, nature and kind whatsoever." The Romneys also were to continue to be responsible for the first and second mortgages until the final purchase installment was made; the Romneys could, and indeed did, place additional mortgages on the property without the permission of Associates. Finally, the Romneys were allowed to propose new capital improvements which Associates would be required to either build themselves or allow the Romneys to construct with compensating modifications in rent or purchase price.

In holding that the transaction between Associates and the Romneys more nearly resembled an option than a sale, the Tax Court emphasized that Associates had the power at the end of ten years to walk away from the transaction and merely lose its $75,000 "prepaid interest payment." It also pointed out that a *deed* was never recorded and that the "benefits and burdens of ownership" appeared to remain with the Romneys. Thus, the sale was combined with a leaseback in which no cash would pass; the Romneys remained responsible under the mortgages, which they could increase; and the Romneys could make capital improvements.[2] The Tax Court further justified its "option" characterization by reference to the nonrecourse nature of the purchase money debt and the nice balance between the rental and purchase money payments.

■ Our emphasis is different from that of the Tax Court. We believe the characteristics set out above can exist in a situation in which the sale imposes upon the purchaser a genuine indebtedness within the meaning of section 167(a), Internal Revenue Code of 1954, which will support both interest and depreciation deductions.[3] They substantially so existed in *Hudspeth v. Commissioner*, 509 F.2d 1224 (9th Cir. 1975) in which parents entered into sale-leaseback transactions with their children. The children paid for the property by executing nonnegotiable notes and mortgages equal to the fair market value of the property; state law proscribed deficiency judgments in case of default, limiting the parents' remedy to foreclosure of the property. The children had no funds with which to make mortgage payments; instead, the payments were offset in part by the rental payments, with the

---

2. There was evidence that not all of the benefits and burdens of ownership remained with the Romneys. Thus, for example, the leaseback agreement appears to provide that any condemnation award will go to Associates. Exhibit 6–F, at p. 5.

3. Counsel differed as to whether the Tax Court's decision that the transaction was not a sale, but at best only an option, is reviewable by this court as a question of law or of fact. We agree with other circuits that, while the characteristics of a transaction are questions of fact, whether those characteristics constitute a sale *for tax purposes* is a question of law. *See American Realty Trust v. United States*, 498 F.2d 1194, 1198–1199 (4th Cir. 1974); *ABKCO Industries, Inc. v. Commissioner*, 482 F.2d 150, 154–155 (3rd Cir. 1973); *Union Planters Nat'l Bank v. United States*, 426 F.2d 115, 117–118 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970). Cases cited by the Commissioner to the effect that the decision before us is essentially factual are inapposite. All of the cited cases deal with purely factual questions to which the legal conclusion is clear. *See Warren Jones Co. v. Commissioner*, 524 F.2d 788 (9th Cir. 1975); *Clodfelter v. Commissioner*, 426 F.2d 1391, 1392 (9th Cir. 1970) (whether a contract had an ascertainable fair market value); *Muheim v. United States*, 524 F.2d 773, 775 (9th Cir. 1975); *Northwestern Acceptance Corp. v. Commissioner*, 500 F.2d 1222 (9th Cir. 1974) (what the intent of the parties was in signing a purported lease agreement). In the instant decision, the factual issues were generally undisputed with only the legal implications uncertain. As stated in *Lundgren v. Commissioner*, 376 F.2d 623, 627 (9th Cir. 1967), our duty is to decide "whether the Tax Court correctly applied the statute to the factual situation found by the Tax Court."

difference met by gifts from the parents to their children. Despite these characteristics this court held that there was a bona fide indebtedness on which the children, to the extent of the rental payments, could base interest deductions. *See also American Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974); *Manuel D. Mayerson*, 47 T.C. 340 (1966).

In none of these cases, however, did the taxpayer fail to demonstrate that the purchase price was at least approximately equivalent to the fair market value of the property. Just such a failure occurred here. The Tax Court explicitly found that on the basis of the facts before it the value of the property could not be estimated. 64 T.C. at 767–768.[4] In our view this defect in the taxpayers' proof is fatal.

Reason supports our perception. An acquisition such as that of Associates if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale *ab initio*. It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subse-

---

4. The Tax Court found that appellants had "not shown that the purported sales price of $1,224,-000 (or any other price) had any relationship to the actual market value of the motel property . . . ." 64 T.C. at 767.

Petitioners spent a substantial amount of time at trial attempting to establish that, whatever the actual market value of the property, Associates acted in the good faith *belief* that the market value of the property approximated the selling price. However, this evidence only goes to the issue of sham and does not supply substance to this transaction. "Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers." *Lynch v. Commissioner*, 273 F.2d 867, 872 (2d Cir. 1959). *See also Bornstein v. Commissioner*, 334 F.2d 779 (1st Cir. 1964); *MacRae v. Commissioner*, 294 F.2d 56 (9th Cir. 1961).

In oral argument it was suggested by the appellants that neither the Tax Court nor they recognized the importance of fair market value during the presentation of evidence and that this hampered the full and open development of this issue. However, upon an examination of the record, we are satisfied that the taxpayers recognized the importance of presenting objective evidence of the fair market value and were awarded ample opportunity to present their proof; appellants merely failed to present clear and admissible evidence that fair market value did indeed approximate the purchase price. Such evidence of fair market value as was relied upon by the appellants, *viz.* two appraisals, one completed in 1968 and a second in 1971, even if fully admissible as evidence of the truth of the estimates of value appearing therein, does not require us to set aside the Tax Court's finding. As the Tax Court found, the 1968 appraisal was "error-filled, sketchy" and "obviously suspect." 64 T.C. at 767 n. 13. The 1971 appraisal had little relevancy as to 1968 values. On the other side, there existed cogent evidence indicating that the fair market value was substantially less than the purchase price. This evidence included (i) the Romneys' purchase of the stock of two corporations, one of which wholly-owned the motel, for approximately $800,000 in the year preceding the "sale" to Associates ($660,000 of which was allocable to the sale property, according to Mr. Romney's estimate), and (ii) insurance policies on the property from 1967 through 1974 of only $583,200, $700,000, and $614,000. 64 T.C. at 767–768.

Given that it was the appellants' burden to present evidence showing that the purchase price did not exceed the fair market value and that he had a fair opportunity to do so, we see no reason to remand this case for further proceedings.

quent year the fair market value of the property increases to an extent that permits the purchaser to acquire an equity.[5]

■ Authority also supports our perception. It is fundamental that "depreciation is not predicated upon ownership of property *but rather upon an investment in property. Gladding Dry Goods Co.,* 2 BTA 336 (1925)." *Mayerson, supra* at 350 (italics added). No such investment exists when payments of the purchase price in accordance with the design of the parties yield no equity to the purchaser. *Cf. Decon Corp.,* 65 T.C. 829 (1976); *David F. Bolger,* 59 T.C. 760 (1973); *Edna Morris,* 59 T.C. 21 (1972). In the transaction before us and during the taxable years in question the purchase price payments by Associates have not been shown to constitute an *investment in the property.* Depreciation was properly disallowed. Only the Romneys had an investment in the property.

■ Authority also supports disallowance of the interest deductions. This is said even though it has long been recognized that the absence of personal liability for the purchase money debt secured by a mortgage on the acquired property does not deprive the debt of its character as a bona fide debt obligation able to support an interest deduction. *Mayerson, supra* at 352. However, this is no longer true when it appears that the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged. Under these circumstances the purchaser has not secured "the use or forbearance of money." *See Norton v. Commissioner,* 474 F.2d 608, 610 (9th Cir. 1973). Nor has the seller advanced money or forborne its use. *See Bornstein v. Commissioner,* 334 F.2d 779, 780 (1st Cir. 1964); *Lynch v. Commissioner,* 273 F.2d 867, 871–872 (2d Cir. 1959). Prior to the date at which the balloon payment on the purchase price is required, and assuming no substan-

tial increase in the fair market value of the property, the absence of personal liability on the debt reduces the transaction in economic terms to a mere chance that a genuine debt obligation may arise. This is not enough to justify an interest deduction. To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. *See Mayerson, supra* at 352.[6] Associates, during the taxable years in question, confronted no such situation. *Compare Crane v. Commissioner,* 331 U.S. 1, 11–12, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).

■ Our focus on the relationship of the fair market value of the property to the unpaid purchase price should not be read as premised upon the belief that a sale is not a sale if the purchaser pays too much. Bad bargains from the buyer's point of view—as well as sensible bargains from buyer's, but exceptionally good from the seller's point of view—do not thereby cease to be sales. *See Commissioner v. Brown,* 380 U.S. 563, 67 S.Ct. 1047, 91 L.Ed. 1301 (1965); *Union Bank v. United States,* 285 F.2d 126, 128, 152 Ct.Cl. 126 (1961). We intend our holding and explanation thereof to be understood as limited to transactions substantially similar to that now before us.

AFFIRMED.

---

5. These consequences would include a determination of the proper basis of the acquired property at the date the increments to the purchaser's equity commenced.

6. Emphasis on the fair market value of the property in relation to the apparent purchase price animates the spirit, if not the letter, of Rev.Rul. 69–77, 1969–1 Cum.Bull. 59.