MARY LOU STIEBLING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stiebling v. Commissioner
Docket No. 8113-92
United States Tax Court
T.C. Memo 1994-233; 1994 Tax Ct. Memo LEXIS 242; 67 T.C.M. (CCH) 3006; May 26, 1994, Filed *242 For petitioner: Michael J. Christianson. For respondent: Patrick W. Lucas. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661 1984
$ 232,741
$ 11,637.05
[1]
$ 58,185.25
1985
308,371
15,418.55
[1]
77,092.75
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether petitioner is entitled to depreciation deductions taken on mobile homes that were part of a "sale-leaseback" transaction; (2) whether petitioner is entitled to a net operating loss deduction in 1984 and 1985; (3) whether petitioner is entitled to a deduction for legal fees incurred in lawsuits arising from her activities as executrix of an estate; and (4) whether petitioner is liable for additions to tax under sections 6653(a) and 6661 and additional interest *243 under section 6621(c). Terms such as "sale", "purchase", "lease", "interest", and "rent" are used in this opinion for convenience and without conclusive effect on the legal substance of the transactions in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time of the filing of the petition, petitioner resided in Newport Beach, California. Mobile Home Transaction
Petitioner has been the owner and operator of various apartment house complexes for over 20 years. Sometime before 1981, petitioner came into contact with John R. Broe (Broe). Broe was offering to sell a mobile home park located in Arizona that was known as the "Sierra Grande Mobile Home Community". Broe gave petitioner a 5-page document that described the property as a 249-space mobile home park with 105 mobile homes that were in place and rented. The terms listed in this document included a stated sales price of $ 4.5 million, with a downpayment of $ 1.2 million cash or acceptable equity. On January 1, 1981, petitioner entered into an agreement (the agreement) with Broe for the purchase of the 105 mobile homes *244 at a purchase price of $ 1.4 million. Petitioner and Broe determined the $ 1.4 million price by reference to the "Kelly Blue Book Mobile Home Guide", October 1980 through March 1981 edition. The agreement provided that petitioner would pay Broe $ 1 in cash on January 1, 1981, as a downpayment on the $ 1.4 million purchase price. The remaining $ 1,399,999 would be paid in a balloon payment on or before January 1, 1988. The agreement also provided that petitioner would pay Broe interest on the unpaid principal of $ 1,399,999, totaling $ 140,000, $ 147,000 and $ 150,500 in 1981, 1982, and 1983, respectively. The interest for each year after 1983 was to be calculated using a reasonable rate of interest that would be determined by petitioner and Broe after consideration of all facts and circumstances, including the then current interest rates, at that later time. Further, the agreement provided that title to the 105 mobile homes would remain with Broe until petitioner paid the full $ 1.4 million purchase price. The agreement also stated: All notices, requests, demands and other communications provided for by this Agreement shall be in writing and (unless otherwise specifically *245 provided herein) shall be deemed to have been given at the time when hand delivered or when mailed in any general or branch United States Post Office, enclosed in a registered or certified post-paid envelope, addressed to the address of the parties stated below or to such changed address as such party may have fixed by notice:
To the Purchaser: MARY LOU STIEBLING, Post Office Box 1073, Newport Beach, California 92663 To the Seller: JOHN R. BROE, 10310 Cameo Drive, Sun City, Arizona 85351 On January 2, 1981, petitioner and Broe entered into a lease-back agreement (the lease), under which petitioner agreed to lease the 105 mobile homes back to Broe until January 1, 1988, unless terminated sooner by the parties. The lease provided that Broe would pay rent of $ 126,000 annually. Under the terms of the lease, petitioner had no role in managing or maintaining the mobile homes. The lease provided that Broe was solely liable for "any and all costs or expenses connected with maintaining the property in good condition" and that Broe would pay all property, transfer, excise, use, sales, or other taxes connected with the mobile homes. The lease further provided that Broe assumed the *246 "entire risk of loss and damage to the property from any and every cause whatsoever"; that Broe would bear the cost of adequate liability and casualty insurance on the mobile homes; and that Broe would indemnify and hold petitioner harmless for "any and every claim, debt, liability, charge or other form of debt against the property or against the Lessor in connection with the property." Pursuant to the agreement, petitioner paid to Broe and deducted on Schedule C $ 140,000, $ 147,000, and $ 150,500 in 1981, 1982, and 1983, respectively. Pursuant to the lease, Broe paid $ 126,000 to petitioner in 1981, 1982, and 1983. In 1984 and 1985, petitioner and Broe were unable to agree to a reasonable interest rate as required by the agreement, and petitioner did not make any payments to Broe in those years. Broe did not make payments to petitioner in 1984 and 1985, even though he continued to operate the mobile home park during these years. Petitioner sold the Malabar Apartments in 1986; however, she did not use the proceeds to accelerate the payment of the $ 1,399,999 principal due on the purchase of the mobile homes. Moreover, petitioner did not pay the $ 1,399,999 principal balance *247 on January 1, 1988, as required by the agreement. Broe did not initiate any legal action against petitioner with respect to her failure to make the balloon payment, and petitioner did not initiate any legal action against Broe with respect to the agreement or the lease. Petitioner claimed a $ 280,000 depreciation deduction on the mobile homes annually in 1981 through 1985. In the notice of deficiency, respondent disallowed the depreciation deductions claimed in 1984 and 1985 and also disallowed net operating loss carryovers deducted in 1984 and 1985. The explanation of the adjustments in the notice of deficiency stated that "It is determined that the following amounts are not allowed because you have not established that these expenses are deductible under the provision of the Internal Revenue Code." Professional Fees
Petitioner was the executrix of the estate of John Steinberg (Steinberg). Petitioner had been a close friend of Steinberg for about 20 years. While Steinberg was terminally ill, petitioner helped Steinberg get legal assistance in order to prepare his will. Petitioner agreed to serve as executrix but was not made a beneficiary under Steinberg's will. In *248 addition to the will, Steinberg had a life insurance policy, the beneficiaries of which were Steinberg's adopted son, his parents, and a former girlfriend. Before his death, Steinberg changed the beneficiary card of this life insurance policy so that the beneficiaries of his policy became the Forty-First Medical Trust, a charity (the charitable trust), and Steinberg's former girlfriend. Petitioner received, and reported as income, executrix fees. After Steinberg's death, his adopted son brought suit against petitioner in her capacity as executrix, alleging that petitioner fraudulently caused Steinberg to name the charitable trust as a beneficiary of a life insurance policy to the exclusion of the adopted son. The charitable beneficiary and the life insurance company that had issued the policy were joined as parties in the litigation. In connection with the defense of this suit, petitioner incurred legal fees. Subsequently, a settlement was reached, and the adopted son dismissed the lawsuit against petitioner and the charitable trust. The charitable trust paid petitioner $ 20,000, which petitioner reported as ordinary income in 1986. After the settlement of the adopted son's *249 suit, petitioner brought a suit for malicious prosecution against the adopted son and his attorney. Petitioner's lawyer, explaining why petitioner brought the malicious prosecution suit, stated in his closing remarks of the malicious prosecution action that petitioner's -- reputation is in the marketplace. She is a businesswoman. This is a matter of public record. Her friends know about it. Her 80-year-old mother knows about these false charges. She had a 20-year relationship with John. Never married. She feels that that relationship has been tarnished by these charges. And what she wants essentially back, more important than anything else and what is paramount, is her reputation. That's all she has at this stage in life. * * *I am sure that* * * [Steinberg] looking down would like to see * * * [his adopted son] and * * * [petitioner] bury the hatchet. This can only be done, as I see it, by clearing up * * * [petitioner's] good name * * *
The malicious prosecution case was tried before a jury, which found in favor of petitioner and awarded her $ 68,435 in actual damages and $ 100,000 in punitive damages. The jury found in a special verdict that the adopted *250 son and his attorney did not have probable cause to commence or maintain the proceeding against petitioner and that the proceeding was commenced with malice. The judgment in the malicious prosecution suit was appealed, and the appellate court held that the lower court had erred in the jury instructions and remanded the case back to the lower court for a second trial. Petitioner did not go forward with the second trial. In the notice of deficiency, respondent disallowed professional fees that petitioner deducted in 1984 and 1985. OPINION Petitioner contends that, because the notice of deficiency that was issued by respondent did not set forth any specific basis for the disallowance of depreciation and net operating loss deductions, any specific basis or bases asserted by respondent in furtherance of respondent's argument that these deductions should be disallowed are new matters within the meaning of Rule 142(a). As a result, petitioner contends that respondent has the burden of proof with respect to the disallowance of the depreciation and net operating loss deductions. Petitioner's argument is contrary to the established principle that the taxpayer bears the burden of proof *251 with respect to claimed deductions. Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133; see Chaum v. Commissioner, 69 T.C. 156, 163-164 (1977). The notice of deficiency sent to petitioner made it clear that claimed depreciation and net operating loss carryovers, in stated amounts, had been disallowed. The bases for disallowance of the depreciation and net operating loss deductions asserted by respondent at trial and in her brief clarify the adjustments in the deficiency notice and are not new matters. See Achiro v. Commissioner, 77 T.C. 881, 890 (1981). Therefore, we proceed to the substantive issues of this case with the burden of proof resting in the normal manner upon petitioner. 1984 and 1985 Mobile Home Depreciation
Petitioner contends that, in addition to the $ 1 downpayment, her depreciable cost basis in the mobile homes should include the $ 1,399,999 loan from Broe, making her adjusted basis $ 1.4 million and thereby entitling her to a $ 280,000 yearly depreciation deduction based on a 5-year recovery period under *252 section 168(b)(3)(A). Citing Mayerson v. Commissioner, 47 T.C. 340 (1966), petitioner contends that "It is a well settled tax law principle that a taxpayer's cost basis in property includes the entire amount of debt issued by such taxpayer in consideration for such property." In Mayerson, we held that the taxpayer was entitled to include a valid debt obligation created by a purchase money mortgage in his depreciable basis of business property. Because we were persuaded that the sale was an arm's-length business transaction that created a bona fide debt obligation, we included the debt in the depreciable basis of the property even though it was not due for 99 years and the taxpayer was not personally liable. However, the facts here are distinguishable. In Mayerson, respondent made no contention that the sale was a sham, and we noted that the facts there gave "no hint of a sham transaction". Id. at 350. Also, in that case, the taxpayer-purchaser made an initial capital investment of $ 10,000 and held title to the property as trustee. Furthermore, the taxpayer-purchaser made repairs, conducted normal maintenance, *253 and made several major improvements on the property in question. In sum, the facts in Mayerson indicated that the transaction was a sale combined with a valid purchase money mortgage in substance and in form. Respondent contends here that petitioner is not entitled to the mobile home depreciation deductions claimed in 1984 and 1985 because the sale-leaseback was a sham transaction without economic substance. Specifically, respondent contends that, because the sale-leaseback lacked economic substance, petitioner did not make a capital investment in the mobile homes and thus that she is not entitled to depreciation deductions claimed on that property. Respondent relies on Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg 64 T.C. 752 (1975), in which the Court of Appeals upheld our decision that the payment of a purchase obligation was not sufficiently definite and thus did not constitute indebtedness for purposes of creating a cost basis for depreciation. In that case, we had emphasized that the sale was combined with a leaseback in which no cash would pass because the lease payments offset the *254 principal and interest payments; that the sellers remained responsible for the mortgages on the property, which they could increase; that a deed was never recorded; that the partnership failed to demonstrate that the purchase price had any realistic relationship to the fair market value of the property; and that, because of this structure and because the debt was nonrecourse, at the end of the 10 years, the partnership had the option of deciding to complete the transaction or walk away from it. Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). In affirming our holding of an invalid indebtedness, the Court of Appeals emphasized that the "fatal defect" was the taxpayer's failure to demonstrate that the purchase price was at least approximately equivalent to the fair market value of the property. Estate of Franklin v. Commissioner, 544 F.2d at 1048. In explaining its emphasis on the equivalence of purchase price and fair market value, the court reasoned as follows: Payments on the principal of the purchase price yield no equity so long as the unpaid *255 balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * * [Id. at 1048.]
The court also reasoned that an acquisition where the purchase price approximates the fair market value "under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon." Id.
Petitioner contends that the "fatal defect" of Franklin is not present here because the $ 1.4 million purchase price was determined by reference to the Kelly Blue Book Mobile Home Guide and, thus, that we cannot exclude the $ 1,399,999 loan from petitioner's basis in the mobile homes. Respondent contends that, even if the $ 1.4 million purchase price approximated the fair market value on the date of purchase, it is highly unlikely that the mobile homes would appreciate in value over their useful life and, instead, would likely depreciate in value. Respondent is apparently arguing that the fair market value of the *256 mobile homes would be sufficiently less than $ 1,399,999 when payment of that obligation would be due and, thus, that the "fatal defect" is present here. The only evidence in the record of the value of the mobile homes in 1988 is petitioner's testimony indicating that in 1988 the transaction still looked profitable to her. We are not required to accept vague, uncorroborated, or self-serving testimony as reliable and true. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The record contains no evidence demonstrating whether the mobile homes appreciated in value beyond the $ 1.4 million price, thereby yielding an equity in the property, or whether the fair market value of the mobile homes declined to the point where the $ 1,399,999 payment due was sufficiently larger than that value. We can infer, however, that petitioner did not believe that she had acquired an equity in the property because of her failure to complete the transaction and effective abandonment of the property. It is well established that a transaction entered into solely for the purpose of tax reduction that has no economic or commercial objective to support it is a sham and without *257 effect for Federal income tax purposes. La Verne v. Commissioner, 94 T.C. 637, 649 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. sum nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). The focus in determining whether a transaction is a sham "is on the entire transaction. Is the taxpayer actually acquiring an asset or any non-tax benefit? Is the asset likely to be forfeited after the tax benefits are reaped?" Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 197 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985). Here, on a cash outlay of $ 59,501 (downpayment plus interest payments less rent income received), petitioner "purchased" net deductions over a 5-year period totaling $ 1,459,500 (depreciation plus interest deductions less rent income). This is a write-off ratio of deductions to investment approaching 25 to 1. There is no evidence that petitioner undertook any responsibility with respect to the mobile homes, and, under the terms of the lease, Broe was *258 solely responsible for maintenance, taxes, and liability and casualty insurance, and he assumed the entire risk of loss and damage to the property from any and every cause. Petitioner testified that she would be in a position to purchase the mobile homes, as well as the underlying land, after she sold the Malabar Apartments. However, petitioner did not pay the remaining principal of $ 1,399,999, even though she sold the Malabar Apartments in 1986. Therefore, Broe held title to the mobile homes under the terms of the agreement. Though petitioner failed to make the $ 1,399,999 balloon payment on the due date of January 1, 1988, Broe did not initiate any legal action against petitioner to compel payment. Likewise, petitioner did not take any legal action in an effort to obtain title to the mobile homes or with respect to the lease, even though Broe continued to operate the mobile homes in 1984 and 1985 without making rent payments. Petitioner testified that her plan was to acquire the underlying land and that the "purchase" of the mobile homes was to give her an advantage in obtaining the balance of the property. Yet she never pursued this plan. Even if she had, the agreement *259 appears more akin to an option than to a bona fide sale. At trial, petitioner testified that she was unable to pay Broe or initiate any legal action against him because she could not locate him and because she suffered a series of personal problems; petitioner's testimony in this respect is not persuasive. There is no evidence that petitioner attempted to reach Broe through the mail at the address in the agreement or at the mobile home park. Petitioner also claims that the debt is recourse, that the period of limitations is open, and, thus, that she could still be sued by Broe for payment of the $ 1,399,999. Given the number of years that have passed without a lawsuit, we have no reason to believe that this is likely. The record shows that petitioner did not acquire an asset or any nontax benefit and that the "investment" was forfeited after the tax benefits had been reaped. In sum, the mobile home transaction was a sham. "It is fundamental that 'depreciation is not predicated upon ownership of property but rather upon an investment in property. Gladding Dry Goods Co., 2 BTA 336 (1925).'" Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976) *260 (quoting Mayerson v. Commissioner, 47 T.C. 340, 350 (1966)), affg. 64 T.C. 752 (1975). When the debt that is used to purchase an asset is unlikely to be paid by the taxpayer, that debt is not a bona fide capital investment and is excluded from the depreciable basis of the asset. Durkin v. Commissioner, 872 F.2d 1271, 1276 (7th Cir. 1989), affg. 87 T.C. 1329 (1986). Because we are persuaded that the $ 1,399,999 loan was part of a sham transaction and without economic substance, we hold that it is not includable in petitioner's basis of the mobile homes. Accordingly, petitioner is not entitled to the depreciation deductions of $ 280,000 in 1984 and 1985. Net Operating Loss Deductions
Respondent contends that petitioner's net operating loss carryovers from 1981 and 1982, which were claimed as net operating loss deductions in 1984 and 1985, were generated in large part by the depreciation deductions on the mobile homes claimed in 1981 and 1982. Respondent contends that, because the mobile home depreciation deductions in 1984 and 1985 are disallowed, the identical *261 depreciation deductions in 1981 and 1982 must also be disallowed. Upon disallowance of the 1981 and 1982 depreciation deductions, respondent contends that petitioner would not have net operating loss carryovers available in 1984 and 1985. Although the period of limitations on petitioner's 1981 and 1982 tax years is not open, there is abundant authority allowing the recalculation of the amount of a net operating loss carryover from a barred year when determining a deficiency for an open year. Hill v. Commissioner, 95 T.C. 437, 440 (1990). Thus, we hold that petitioner's net operating loss carryovers must be recomputed to reflect the disallowance of the mobile home depreciation deductions in 1981 and 1982. As a result, the net operating loss deductions claimed by petitioner in 1984 and 1985 are disallowed to the extent that there is no carryover available after eliminating the losses generated by the mobile home depreciation deductions. On brief, petitioner contends that she is entitled to increase her 1982 net operating loss carryover because respondent had determined in an examination of petitioner's 1982 return that she had an available carryover *262 from 1982 of $ 329,673, and because of her failure to deduct a loss from a partnership in 1982. Also on brief, petitioner contends that she is entitled to increase her net operating loss carryover from 1985 as a result of her failure to deduct expenses incurred in 1985 in connection with another investment. Petitioner has not introduced evidence that proves her entitlement to these belatedly claimed increases in net operating loss carryovers. No allowance may be made with respect to them. Legal Fees
Respondent contends that legal fees of $ 52,476 and $ 59,175.26, which petitioner incurred in the fraud and malicious prosecution actions and claimed as deductions in 1984 and 1985, respectively, should be disallowed. Fraud Action
Petitioner contends that the legal fees that were incurred in the fraud action are deductible under sections 162, 212, and 170(a). Section 162(a) provides for a deduction of all of the ordinary and necessary expenses paid or incurred in carrying on any trade or business. There is no evidence in the record suggesting that petitioner was in the trade or business of serving as an executrix. Petitioner agreed to serve as executrix because of her *263 friendship with Steinberg. Thus, petitioner is not entitled to deduct legal fees incurred in the fraud action under section 162. Seidler v. Commissioner, 18 T.C. 256 (1952). Section 212 provides a deduction for all of the ordinary and necessary expenses paid or incurred for the production and collection of income. Petitioner contends that the legal fees were incurred in furtherance of the production of executrix fee income and, thus, that the legal fees are deductible under section 212. Petitioner admits that, because she was never designated as beneficiary of Steinberg's life insurance policy, she did not stand to collect from the policy. Petitioner contends that, as executrix, her failure to defend against the fraud action would have subjected her to liability for mismanagement of the estate, yet petitioner does not argue, nor do we have reason to believe, that her failure to defend against the fraud action would have caused petitioner to lose her right to executrix fees. Thus, we are not persuaded that the legal fees that were incurred with respect to the fraud action were incurred by petitioner for the production or collection of her executrix *264 fee income. Cf. Estate of Leaf v. Commissioner, T.C. Memo. 1964-249 (attorney fees paid by executrix in defense of a will contest deductible under section 212 because the parties agreed that the executrix would have received no executrix fees if the will had been declared invalid in the will contest). Petitioner also contends that she is entitled to deduct the legal fees for the fraud action under section 1.212-1(i), Income Tax Regs., which provides: Reasonable amounts paid or incurred by the fiduciary of an estate or trust on account of administration expenses, including fiduciaries' fees and expenses of litigation, which are ordinary and necessary in connection with the performance of the duties of administration are deductible under section 212, notwithstanding that the estate or trust is not engaged in a trade or business, * * * But see section 642(g) and the regulations thereunder for disallowance of such deductions to an estate where such items are allowed as a deduction under section 2053 or 2054 in computing the net estate subject to the estate tax.
This regulation is inapplicable here because it allows a deduction on the estate's *265 income tax return or as a deduction in computing the net estate subject to the estate tax, not an individual deduction by the fiduciary. Petitioner, citing Archbold v. United States, 195 Ct. Cl. 278, 444 F.2d 1120 (1971), contends that the legal fees that were incurred in the fraud action are deductible under section 170(a) as a charitable contribution because they were incurred in connection with carrying out Steinberg's charitable contribution to the charitable trust. In Archbold, a taxpayer was permitted to deduct legal fees incurred in opposing highway construction through land that she had previously donated to the United States for use as a park because the legal fees were "incidental to the original gift". Id. at 1124. The reasoning of Archbold does not entitle petitioner to deduct the fraud action legal fees as a charitable contribution. The Court of Appeals for the Ninth Circuit has stated: We have repeatedly held that donations to a charitable organization are deductible only if made out of a "detached and disinterested generosity." See, e.g., Allen v. United States, 541 F.2d 786, 787 (9th Cir. 1976). *266 Where a contribution benefits the donor as well as the charity, the primary purpose controls. The Commissioner need not show that personal benefit is the sole motive; a contribution may not be deducted where the expectation of personal benefit is the primary motive. * * * [Babilonia v. Commissioner, 681 F.2d 678, 679 (9th Cir. 1982), affg. T.C. Memo. 1980-207.]
While petitioner's defense of the fraud action was related to Steinberg's gift to the charity, we are not persuaded that the defense was undertaken primarily for charitable purposes. On brief, petitioner admits that her defense of the fraud action would assist in the "clearance of her name." On this record, we are persuaded that personal vindication, instead of a charitable endeavor, was the primary motive of petitioner in defending against the fraud action. As a result, the legal fees that were incurred in the fraud action do not constitute a charitable contribution. Malicious Prosecution
Petitioner contends that, because the malicious prosecution action was brought by petitioner to clear the injury to her business reputation caused by the fraud action, *267 she is entitled to deduct the legal fees that were incurred in the malicious prosecution action as ordinary and necessary trade or business expenses under section 162 or as expenses incurred in connection with the production of income under section 212. Respondent contends that the legal fees that were incurred in the malicious prosecution action are personal expenses of petitioner. We agree with respondent. There is no evidence that the fraud action had any effect on petitioner's business reputation. Petitioner contends that she was trying to sell the Malabar Apartments and that her being "labeled" in the fraud action could have adversely affected her ability to negotiate the best sale. Nevertheless, petitioner admits that she sold the Malabar Apartments in 1986, and she has presented no evidence that her ability to sell this real estate was affected by the fraud action. Thus, the facts here are distinguishable from Draper v. Commissioner, 26 T.C. 201 (1956), where we held that a professional dancer was entitled to deduct legal expenses that were incurred in a libel action against a woman who made statements about the dancer that resulted in lost *268 dance bookings and revenue. In United States v. Gilmore, 372 U.S. 39, 48 (1963), the Supreme Court stated: the characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim * * * Here, the malicious prosecution action arose from the insurance fraud action, which arose from petitioner's personal relationship with Steinberg. The personal nature of these lawsuits is highlighted by petitioner's counsel's closing remarks in the malicious prosecution action. Section 262 prohibits the deduction of personal expenses; therefore, petitioner is not entitled to deduct the legal fees that were incurred in the malicious prosecution suit. Additions to Tax
Respondent has determined that petitioner is liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1984 and 1985. Negligence, as used in section 6653(a), is *269 defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). In some circumstances, good faith reliance on expert advisers negates applicability of the addition to tax for negligence. Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). With respect to the depreciation deductions and the net operating loss carryovers, petitioner contends that she was not negligent because she relied upon the advice of her accountant. Petitioner failed to establish the nature of the advice that was given by the accountant or the extent of her reliance on such advice. Thus, we have no basis on which to evaluate the reasonableness of petitioner's alleged reliance. Petitioner also contends that she relied upon the results of a 1982 Internal Revenue Service examination that did not dispute the mobile home depreciation deductions taken *270 in that year. Petitioner claims that she believed that respondent analyzed the depreciation deductions and concluded that they were proper. The 1982 audit, and respondent's failure to challenge the depreciation deductions at that time, does not absolve petitioner from her duty of reasonable care. On this record, we are not satisfied that petitioner made a reasonable attempt to ascertain the correctness of the depreciation and net operating loss deductions in 1984 and 1985. With respect to the legal fee deductions, petitioner contends that, even if the deductions were erroneous, such errors were due to a misunderstanding of the law and were taken in good faith. In Yelencsics v. Commissioner, 74 T.C. 1513, 1533 (1980), we held that the taxpayer was not negligent in failing to treat payments to him as constructive dividends because the record demonstrated that the issue was a complex legal issue and that the taxpayer's position with respect to the payments was not untenable. Nothing in the record persuades us that petitioner had an honest misunderstanding of a complex or unclear law with respect to the legal fee deductions. We hold that petitioner *271 is liable for the section 6653(a) additions to tax for 1984 and 1985. Respondent also determined that petitioner is liable for additions to tax under section 6661 for substantial understatement of income tax for 1984 and 1985. Section 6661(b)(2)(B)(i) provides that the amount of the understatement of tax shall be reduced by the amount of the understatement for which there is substantial authority for the treatment adopted by the taxpayers in their returns. Section 6661(c) provides that the Commissioner may waive all or any part of the section 6661 addition to tax upon a showing that the taxpayer had reasonable cause for the understatement and acted in good faith. The denial of a waiver under section 6661(c) is reviewable by the Court on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). Petitioner has failed to cite substantial authority for the mobile home depreciation deductions, the net operating loss deductions, or the legal fee deductions. See Antonides v. Commissioner, 893 F.2d 656, 660 (4th Cir. 1990), affg. 91 T.C. 686 (1988) (cases that are factually *272 distinguishable do not constitute substantial authority). Further, we have previously concluded that petitioner's negligence caused the understatement and thus the denial of a waiver under section 6661(c) was appropriate. Accordingly, we conclude that petitioner is liable for the section 6661 additions to tax for 1984 and 1985. Respondent also contends that the interest payable under section 6601 with respect to the substantial underpayment attributable to the mobile home transaction should be determined using an interest rate of 120 percent of the underpayment rate for 1984 and 1985 under section 6621(d). Section 6621(d) provides for this increased interest rate in the case of substantial underpayment attributable to tax-motivated transactions. Section 6621(c)(3)(A)(v), effective for interest accruing after December 31, 1984, defines the term "tax motivated transaction" to include any sham or fraudulent transaction. Because we have concluded that the mobile home transaction was a sham, the transaction falls within the statutory definition of a "tax-motivated transaction", and thus an increased interest rate applies to the underpayment attributable to the mobile home transaction. *273 Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the entire deficiency.↩