113 F.3d 1242
 79 A.F.T.R.2d 97-2856, 97-1 USTC P 50,467
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Mary Lou STIEBLING, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 95-70391.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 9, 1997.
Decided May 14, 1997.
 
 1
 Before FLETCHER and TROTT, Circuit Judges, and JENKINS,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Mary Lou Stiebling ("Stiebling"), a taxpayer, appeals from the decision of the United States Tax Court disallowing income tax deductions she had claimed in 1984 and 1985 for depreciation and net operating loss carryovers based upon her agreement to purchase 105 mobile homes for $1.4 million with a down payment of $1, and for legal fees she incurred in connection with two civil lawsuits involving a disgruntled heir of a decedent for whose estate Stiebling had served as executrix. She also appeals from the Tax Court's approval of statutory additions to tax for negligence and substantial understatement and its imposition of increased interest on her deficiency based upon her participation in a "tax-motivated" sham transaction. Stiebling v. Commissioner, 67 T.C.M. (CCH) 3006 (1994). We have jurisdiction of this appeal from the United States Tax Court pursuant to 26 U.S.C. § 7482(a), and we affirm.
 
 
 4
 * We review tax court decisions on the same basis as civil bench trials held in federal district court. Ball, Ball, & Brosamer, Inc. v. Commissioner, 964 F.2d 890, 891 (9th Cir.1992). We review the Tax Court's findings of fact and inferences drawn from facts under the clearly erroneous standard, Allen v. Commissioner, 925 F.2d 348, 351 (9th Cir.1991), including whether a transaction is lacking in economic substance, Erhard v. Commissioner, 46 F.3d 1470, 1476 (9th Cir.1995); Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir.1980), cert. denied, 452 U.S. 961 (1981).[1] We review the Tax Court's legal conclusions de novo for correctness, including both the correctness of the legal standards applied by the Tax Court and the application of the legal standards to the facts found. Sacks v. Commissioner, 69 F.3d 982, 986 (9th Cir.1995).
 
 II
 
 5
 In taking deductions for depreciation, a taxpayer makes adjustments to the basis of the property,[2] yielding an adjusted basis. See 26 U.S.C. §§ 167, 168, 1012, 1016. Computing the adjusted basis starts with the property's cost, including the portion of the purchase price represented by debt, unless the debt is unlikely to be paid. To be included in the adjusted basis, the indebtedness must be genuine.[3]
 
 
 6
 Stiebling asserts that her January 1, 1981 agreement to pay $1.4 million on January 1, 1988 for 105 mobile homes located in the Sierra Grande Mobile Home Community in Arizona represented a genuine indebtedness because it was based upon the fair market value of the units as of January 1, 1981--the date Stiebling made her $1 down payment. She submits that it would have been imprudent for her to abandon the transaction at the time the agreement was made, the substance of the transaction being evidenced by the direct correspondence between purchase price and fair market value at that time. The cost of the property reflected in the unpaid purchase price provided a proper basis for depreciation, Stiebling argues, notwithstanding the fact that she never actually paid the purchase price, took possession of the mobile homes, or otherwise sought to enforce the purchase agreement after 1983.
 
 
 7
 Indeed, after making "interest-only" payments in 1981, 1982 and 1983, Stiebling ceased paying anything towards the purchase of the mobile homes. Nevertheless, she claimed a $280,000 deduction for depreciation on the mobile homes each year from 1981 through 1985, totalling $1,400,000.[4]
 
 
 8
 In Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir.1976), we affirmed the Tax Court's disallowance of deductions for depreciation and interest arising from the purported sale and leaseback of an Arizona motel, the Thunderbird Inn. We observed that "[a]n acquisition ... if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale." Id. at 1048. In contrast, where "the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase," this chance "fails to supply the substance necessary to justify treating transaction as a sale ab initio." Id. In Estate of Franklin, the taxpayer failed to demonstrate that "the purchase price was at least approximately equivalent to the fair market value of the property," and thus failed to establish the genuineness of the debt incurred as the basis for the depreciation. Id. Lack of genuine indebtedness also justified disallowance of deductions for interest paid on the purchase. "For debt to exist," we explained, "the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price." Id. at 1049. "[D]uring the taxable years in question," the taxpayer in Estate of Franklin "confronted no such situation." Id.
 
 
 9
 Relying on Estate of Franklin, Stiebling asserts that an indebtedness created under a sale-leaseback agreement should be recognized for depreciation purposes where the purchase price "is at least approximately equivalent to the fair market value of the property at the time of purchase," which Stiebling deems to be January 1, 1981. See also Hudspeth v. Commissioner, 509 F.2d 1224 (9th Cir.1975) (recognizing genuine indebtedness in a sale-leaseback transaction in which purchase price approximated the value of the property). She argues that it would have been imprudent for her to abandon the purchase agreement given the close parity between fair market value and purchase price in 1981, and that the reasonableness of making the $1,400,000 capital investment in 1981 establishes the genuineness of the debt represented by her 1981 promise to pay the purchase price seven years later on January 1, 1988.
 
 
 10
 Stiebling measures the equivalence of market value and purchase price as of the date the agreement was made. Yet nothing in Estate of Franklin requires the Tax Court to measure equivalence as of the date of the agreement. Indeed, where a purchase agreement contemplates the making of a large balloon payment years after initial entry into the agreement, cases following Estate of Franklin have compared market value and purchase price at the time the balloon payment would have been made rather than on the date of the agreement itself.
 
 
 11
 For example, in Hildebrand v. Commissioner, 967 F.2d 350, 351-53 (9th Cir.1992), we relied upon Estate of Franklin in affirming the Tax Court's determination that purchases of timeshare resort housing lacked economic substance where the value of the timeshares was significantly lower than the amount of the balloon payments at the time that the balloon payments became due, that is, thirty years from the date of purchase. In Hildebrand, the taxpayers conceded the obvious: " '[n]aturally, if the value of the timeshare in year 30 was less than the amount due at that time the purchaser would forfeit his timeshare units rather than make the full balloon payment.' " Id. at 351. See also Hilton v. Commissioner, 671 F.2d 316 (9th Cir.1982) (per curiam), affirming 74 T.C. 305 (1980), cert. denied, 459 U.S. 907 (1982); Lukens v. Commissioner, 945 F.2d 92, 96-97 (5th Cir.1991); Coleman v. Commissioner, 16 F.3d 821, 827-31 (7th Cir.1994) (decreasing fair market value of property over the term of the transaction offered no incentive to buyer to make $6.5 million balloon payment; transaction lacked economic substance).
 
 
 12
 Likewise, it seems equally obvious that a significant disparity between the unpaid purchase price and the residual value of the 105 mobile homes on January 1, 1988--the time Stiebling's $1,399,999 balloon payment was to be made--supports an inference that Stiebling would abandon the transaction and that the entire transaction lacked economic substance from the beginning.[5]
 
 
 13
 In affirming the disallowance of her deductions, the Tax Court pointed to Stiebling's failure to present evidence concerning the residual value of the mobile homes as of January 1, 1988. The Tax Court inferred that the 105 mobile home units would be worth significantly less after seven years, buttressed by Stiebling's own depreciation of their total cost over a mere five years. When Stiebling was confronted in 1988 with making a capital investment in the amount of the unpaid purchase price of $1,399,999, the 1981 equivalence of market value and purchase price would largely have vanished. Stiebling's course of conduct following her entry into the agreement, particularly her apparent abandonment of the transaction after receiving substantial tax benefits, further corroborated the transaction's lack of economic substance.[6]
 
 
 14
 As we explained in Estate of Franklin, depreciation is "predicated ... upon an investment in property" and no investment exists "when payments of the purchase price in accordance with the design of the parties yield no equity to the purchaser." 544 F.2d at 1049. Stiebling's one-dollar down payment and the "interest-only" payments made pursuant to her agreement in 1981, 1982, and 1983 yielded no equity to her as the purchaser. She made no other payments against the unpaid purchase price whatsoever. By abandoning the transaction, Stiebling lost "no more than a mere chance to acquire an equity in the future should the value of the acquired property increase." Id. at 1048. In the meantime she enjoyed substantial tax benefits predicated upon the mere chance that she might actually pay for the property she depreciated.
 
 
 15
 Stiebling fails to persuade this court that the Tax Court's determination that her purported $1,400,000 mobile home purchase lacked economic substance was clearly erroneous. Based upon that determination, the Tax Court correctly disallowed her deductions for depreciation and net operating loss carryovers for 1984 and 1985, and we therefore affirm.
 
 III
 
 16
 Stiebling also claimed deductions for legal fees she contends were incurred in connection with her role as executrix of the estate of a deceased friend, John Steinberg. She was sued by Steinberg's adopted son, who claimed that Stiebling had fraudulently induced Steinberg to substitute a charitable trust in place of the adopted son as beneficiary of Steinberg's life insurance policy. This first lawsuit was settled, and Stiebling received $20,000 from the charitable trust, which she reported as income. In turn, Stiebling filed a second lawsuit against the decedent's adopted son and his attorney, alleging malicious prosecution and obtaining a jury verdict in her favor of $68,435 in actual damages and $100,000 in punitive damages.[7]
 
 
 17
 The Tax Court concluded that Stiebling's legal fees arose out of litigation in connection with her personal relationships, not her income-producing activities, and that she was not entitled to a deduction. Even assuming that Stiebling's services as executrix were income-producing activities,[8] the disgruntled heir's lawsuit plainly did not involve a challenge to Stiebling's status or her fees as executrix, or her administration of the estate. Rather, it arose out of allegations concerning Stiebling's relationship with the decedent, John Steinberg, prior to his death and prior to her assuming her role as executrix of his will. Stiebling's own suit against the heir was also personal in nature. She was not seeking to generate or protect fee income as executrix, or to vindicate any interest or claim of the estate; she was seeking personal vindication to repair the damage to her own reputation caused by the first lawsuit. See Roemer v. Commissioner, 716 F.2d 693, 700 (9th Cir.1983) (legal fees incurred in lawsuits seeking damages for personal injury to reputation or to gain personal vindication are personal in nature because there is no production of income).
 
 
 18
 The Tax Court's determination that the first lawsuit "arose from petitioner's personal relationship with Steinberg," 67 T.C.M. (CCH) at 3007-7, and was not connected to "the production or collection of her executrix fee income," id. at 3007-6, was not clearly erroneous. The Tax Court correctly concluded that the legal fees incurred by Stiebling in defending herself in the first lawsuit and in prosecuting her own malicious prosecution claims in the second lawsuit[9] do not qualify as "ordinary and necessary expenses paid or incurred during the taxable year ... for the production or collection of income," 26 U.S.C. § 212, and for that reason, we affirm.
 
 IV
 
 19
 Stiebling also appeals from the additions to tax imposed upon her on grounds of negligence under 26 U.S.C. § 6653(a) (1988) (repealed) and substantial understatement under 26 U.S.C. § 6661 (1988) (repealed),[10] as well as increased interest under 26 U.S.C. § 6621(c) (1988) (repealed).
 
 
 20
 For purposes of § 6653(a), "negligence" was defined as a lack of due care or failure to do what a reasonable and prudent person would do under similar circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir.1991). The Tax Court did not clearly err in rejecting Stiebling's assertion that she had reasonably relied in good faith on her accountant's advice in taking the disallowed deductions and in finding that Stiebling did not make a reasonable effort to determine the correctness of the deductions. Therefore, the Tax Court correctly held Stiebling liable for additions to tax under 26 U.S.C. § 6653(a).[11] See Hildebrand, 967 F.2d at 353. Having found that Stiebling acted negligently, and therefore did not act with "reasonable cause" under § 6661(c), the Tax Court correctly concluded that the waiver[12] based upon good faith and reasonable cause for the understatement under § 6661(c) did not apply.
 
 
 21
 Concerning the addition to tax for substantial understatement pursuant to 26 U.S.C. § 6661 (1988), Stiebling relies on § 6661(b)(2)(B), which provided that "[t]he amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to--(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment...." 26 U.S.C. § 6661(b)(2)(B) (1988) (repealed) (emphasis added). "Substantial authority" supports a position "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Treas.Reg. § 1.6661-3(b)(1). See Cramer v. Commissioner, 64 F.3d 1406, 1415 (9th Cir.1995). The few authorities cited by Stiebling as supporting her treatment of her abandoned mobile home "purchase" prove readily distinguishable on their facts.[13] Cases such as Estate of Franklin and more recently, Hildebrand, line up squarely against her. The Tax Court correctly concluded that Stiebling's tax treatment of the mobile home purchase agreement was not supported by "substantial authority."
 
 
 22
 In light of the Tax Court's findings concerning the lack of economic substance of the mobile home purchase transaction, the inferences drawn by the Tax Court in support of the additions to tax and the application of an increased interest rate (120% of the underpayment rate) under 26 U.S.C. § 6621(d) (1988) (repealed) because of the "tax-motivated" mobile home transaction are also not clearly erroneous, and we affirm.
 
 
 23
 AFFIRMED.
 
 
 
 *
 Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Tax Court's determination of additions to tax also involve factual findings that are reviewed under the clearly erroneous standard. Allen v. Commissioner, 925 F.2d at 353
 
 
 [2]
 Basis simply refers to a way to measure an investment in property for tax purposes, usually the cost of the property to the taxpayer. See 26 U.S.C. § 1012
 
 
 [3]
 As a rule, the Commissioner's determination of deficiency in income tax is presumptively correct, Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1189 (9th Cir.1984), and the taxpayer bears the burden of showing entitlement to a particular deduction. Norgaard v. Commissioner, 939 F.2d 874, 877 (9th Cir.1991)
 
 
 [4]
 Pursuant to the agreement, Stiebling paid $140,000 in 1981, $147,000 in 1982, and $150,000 in 1983 to the seller John R. Broe. Broe retained possession of the 105 mobile homes and under a lease agreement dated January 2, 1981, Broe paid Stiebling $126,000 a year for 1981, 1982 and 1983. When Stiebling ceased making interest payments after 1983, Broe ceased making lease payments, but remained in continuous possession of the 105 units
 Thus, as the Tax Court observed, "on a cash outlay of $59,501 (downpayment plus interest payments less rent income received), petitioner 'purchased' net deductions over a 5-year period totaling $1,459,500 (depreciation plus interest deductions less rent income). This is a write-off ratio of deductions to investment approaching 25 to 1." 67 T.C.M. (CCH) at 3007-4.
 
 
 [5]
 Even if, as Stiebling suggests, expected cash flow rather than residual value is a preferred indicator of "imprudent abandonment" under Estate of Franklin, the expected cash flows under her lease agreement with Broe on their face did not promise a non-tax gain to Stiebling of any consequence. In the first three years, Stiebling's "interest-only" payments to Broe exceeded by nearly $60,000 the lease payments Broe paid to Stiebling over the same period
 That the purchase transaction was doomed from the outset may also be inferred from the Tax Court's finding that Stiebling's interest payment obligation after 1983 was made subject to future agreement as to interest rate. Stiebling and Broe never reached any further agreement concerning interest. In effect, Stiebling had made an "agreement to agree" as to a material term of the purchase--a sort of built-in contractual self-destruct device that derailed the whole transaction as soon as it was triggered in 1984.
 
 
 [6]
 The Tax Court also noted that Stiebling never obtained title or took possession of the mobile homes, or "undertook any responsibility with respect to the mobile homes." 67 T.C.M. (CCH) at 3007-4
 
 
 [7]
 Because of an error in jury instructions given, the appellate court reversed the award and remanded the case. Stiebling did not pursue a second trial on her claims
 
 
 [8]
 Stiebling asserts that serving as an executrix was an income-producing activity under § 212 of the Internal Revenue Code, regardless of whether her status as executrix arose out of her long-term friendship with John Steinberg. She reads the Tax Court's findings that she "received, and reported as income, executrix fees" and that the first lawsuit was "brought against Petitioner in her capacity as executrix," 67 T.C.M. (CCH) at 3007-2, as amounting to a finding that the first lawsuit arose in connection with her income-producing activity and therefore was not personal in nature. See United States v. Gilmore, 372 U.S. 39, 48 (1963) ("the characterization, as 'business' or 'personal,' of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities.")
 
 
 [9]
 Stiebling concedes that the second "malicious prosecution" lawsuit arose out of the first "fraud" lawsuit, and that the determination of deductibility as to the first should control the outcome as to second
 
 
 [10]
 Current provisions concerning understatement of tax liability and taxpayer negligence, adopted in 1989, are found at 26 U.S.C. § 6662 (1994)
 
 
 [11]
 Stiebling contends that she also had relied upon a favorable Internal Revenue Service examination of her 1982 returns which reflected the depreciation and interest deductions. Of course, Stiebling was still making annual interest payments under the purchase agreement in 1982; she did not abandon the transaction until after her third payment in 1983. As we said in Hildebrand, "In the face of a transaction which clearly lacked economic substance, and which was designed to produce tax benefits out of proportion with total investment, these facts do not establish the exercise of due care." 967 F.2d at 353
 
 
 [12]
 26 U.S.C. § 6661(c) (1988) (repealed) provided:
 (c) Authority to waive.--The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.
 
 
 [13]
 "A case having some facts in common with the tax treatment at issue would not be considered particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue." Norgaard v. Commissioner, 939 F.2d at 880-81